**UNITED STATES v. LA TUFF TRANSFER SERVICE, Inc., et al.**

**Cr. No. 7331.**

United States District Court
D. Minnesota. Third Division.

Dec. 30, 1950.

376

C. U. Landrum, U. S. Atty. and William P. Murphy, Asst. U. S. Atty., St. Paul, Minn., for plaintiff.

Gordon E. Larkin, Minneapolis, Minn., for defendants.

BELL, District Judge.

This prosecution was instituted under the provisions of Section 222(a) of the Interstate Commerce Act 49 U.S.C.A. § 322(a).

An information was filed containing eighteen (18) counts, charging the defendant LaTuff Transfer Service, Inc., hereinafter referred to as LaTuff Transfer, with engaging in the transportation of property by motor vehicle in interstate commerce on public highways, for compensation, without a certificate of public convenience and necessity having been issued by the Interstate Commerce Commission authorizing it to engage in such operations, in violation of 49 U.S.C.A. § 306(a). The defendant Joseph J. LaTuff was charged in all counts with aiding and abetting the corporation in the commission of said offenses.

The defendants have entered a plea of guilty to the first six counts in the Information. Counts VII to XIII, inclusive, have been dismissed on motion of the Government. The defendants entered a plea of not guilty to Counts XIV to XVIII, inclusive.

The Government and the defendants stipulated the facts covering the five counts to which the plea of not guilty was interposed, that is, Counts XIV, XV, XVI, XVII and XVIII of the information. The facts and circumstances related in Count XIV, the details of which are given in full, are admitted to be similar in all particulars to those in Counts XV, XVI, XVII and XVIII.

It was agreed that the primary issue to be determined in this case is whether the

operator of a truck rental business may lawfully, without a certificate or permit from the Interstate Commerce Commission, furnish its motor vehicle for compensation to a shipper for a one-way outbound haul for delivery of the shipper's property moving in interstate commerce, where the driver is an employee of the owner-operator and is jointly selected by the operator and the shipper to serve as an employee of the shipper in driving the vehicle to the end of the outbound trip. Upon reaching the destination of the outbound trip, the driver takes over the vehicle and serves as the agent of, and driver for, the owner-operator for further leasing of the equipment by the operator to an authorized motor carrier in transporting general commodities in interstate commerce for compensation, as well as transporting unprocessed agricultural commodities for shippers on the return to the original point.

Defendant LaTuff Transfer Service, Inc. (Hereinafter called "LaTuff Transfer"), a corporation, was and is engaged in operating a truck rental business. It owned seven tractors and fourteen semi-trailers, which equipment was furnished to shippers and other motor carriers on a one-way trip lease basis. LaTuff Transfer in conducting its motor rental business employed a number of union truck drivers, including one Thane Hamlet. Joseph J. LaTuff was president and general manager in active charge of all operations of LaTuff Transfer.

Char-Gale Manufacturing Company (hereinafter referred to as "Char-Gale"), was and is a corporation engaged in processing and manufacturing air cooling and furnace fittings, etc., operating a plant in Minneapolis, Minnesota, from which its products were transported to many parts of the United States.

The arrangements under which motor equipment was furnished to Char-Gale by LaTuff Transfer to transport the property referred to in Count XIV are embodied in an agreement dated July 1, 1949. LaTuff Transfer is designated as lessor and Char-Gale as lessee in that agreement. Similar arrangements were in effect at the time the shipments referred to in Counts XV to XVIII, inclusive, were transported. In substance, the agreement recites that: (1) The lessor (LaTuff Transfer) shall maintain the vehicles in seviceable operating condition and repair; (2) the lessor shall furnish all necessary lubricating oil and gasoline; (3) the lessor shall register said vehicles as directed by the lessee in any state in which they are to be operated and shall pay all necessary license fees and operating taxes required by such state; (4) the lessor shall provide all necessary housing required for the maintenance, storage and repair of such vehicles; (5) the lessee (Char-Gale) shall operate said vehicles in furtherance of its own business as manufacturer, wholesaler, jobber, processor or retailer, and not as a motor carrier for hire; it shall operate said vehicles by its own employees and shall assume full resonsibility for their operation in a reasonably safe and prudent manner; (6) the lessor assumes no responsibility for the safe transit or storage of cargo handled by said vehicles but shall carry fire, theft and collision insurance on the leased equipment and shall look to such insurance only, and not to lessee for indemnity for damage or injury to such equipment while operated by the lessee; (7) the lessee shall assume all public liability for damages or injuries to persons or property which may arise by reason of any negligence in its use and operation of said vehicles; (8) as rental for the use of said vehicles, the lessee shall pay to the lessor the sum of twenty cents per mile for all the mileage over which it shall operate; the lessee is required to report such mileage to the lessor weekly (or monthly), substantiated by reports of terminating and intermediate points to and from and through which the vehicles shall be operated, also by driver's logs and such other records as may be available and required by the lessor; rentals are to be paid by the lessee to the lessor monthly; and (9) the agreement is effective upon execution and delivery and remains in effect for a period of one year and thereafter until either party terminates the same by written notice.

378

A typical movement under the agreement (Count XIV) is described in the agreed facts to be as follows:

On July 29, 1949, a motor tractor semi-trailer unit was furnished by LaTuff Transfer for a one-way trip to transport property of Char-Gale from Minneapolis, Minn., to Baltimore, Md. Hamlet drove the equipment from LaTuff Transfer's garage in Minneapolis to Char-Gale's docks in the same city for loading. Employees of Char-Gale loaded the trailers with property and the unit was driven by Hamlet from Minneapolis to Baltimore, at which point the lading in the trailer was unloaded by the purchaser of the property hauled. LaTuff Transfer and Char-Gale claim that the arrangements for the semi-trailer unit ended at Baltimore simultaneously with the unloading of the cargo; also that it was their understanding that Hamlet was to serve as an employee of Char-Gale and driver of the equipment on the outbound trip, and that the equipment after it was unloaded at Baltimore was to be turned over to LaTuff Transfer.

After the cargo was unloaded, Hamlet, under instructions from, and as driver for, LaTuff Transfer, drove the tractor unit from Baltimore to Philadelphia, Pa. At that point Hamlet, acting as agent for La-Tuff Transfer, executed a lease of the equipment, with himself as driver, to Eastern Motor Express Company, an authorized motor carrier, to transport property in interstate commerce, for compensation, under a lease contract and a load of freight was thereupon hauled on the same unit from Philadelphia, Pa., to Chicago, Ill., in the name of Eastern Motor Express Company as carrier.

At Chicago, Hamlet, acting under instructions from, and as driver for, LaTuff Transfer, leased the same tractor unit, with himself as driver, to United Shipping Company, an authorized motor carrier, under a lease contract and transported a load of traffic to Minneapolis, Minn. After the unit was unloaded at Minneapolis, it was returned to the service of LaTuff Transfer in the same city.

LaTuff Transfer collected from Char-Gale a total of $280.00, computed on the basis of twenty cents per mile for 1400 miles (the distance from Minneapolis to Baltimore); and collected from Eastern Motor Express Company $152.18 and from United Shipping Company $104.17, for the services described above. Hamlet received from Char-Gale $112.86 as wages for driving 1900 miles, 1400 of which were involved in the trip from Minneapolis to Baltimore and the other 500 on a prior trip made to Fargo, North Dakota, not involved in any counts of the information. He received $114.00 gross pay, and Char-Gale deducted $1.14 for Federal old age benefits, making the net amount $112.86. He was paid at the rate of six cents per mile for the trip from Baltimore to Philadelphia, thence to Chicago, Illinois, and return to Minneapolis, by and on behalf of LaTuff Transfer in the sum of $84.00. The check of Char-Gale for $112.86 issued to Hamlet was under a power of attorney cashed by LaTuff Transfer and by it credited to, and applied on, an existing indebtedness of Hamlet to LaTuff Transfer.

Neither LaTuff Transfer, Joseph J. La-Tuff, Char-Gale, nor Hamlet has at any time held a certificate, permit or any other authorization from the Interstate Commerce Commission for the transportation of property in interstate commerce by motor vehicle on public highways, for compensation.

Char-Gale maintains the following types of insurance (a) Public liability, bodily injury and property damage insurance policies which contain provisions specifically referring to hired automobiles engaged in long-haul trucking, in connection with which Char-Gale regularly reported and paid premiums on all trips involving tractor-trailer units supplied to it under agreement from LaTuff Transfer; (b) Cargo insurance to protect merchandise owned by it during transit, and Char-Gale reported to the insurance company all loads hauled in vehicles supplied or furnished by LaTuff Transfer; (c) Employer's liability insurance, which includes chauffeurs and helpers. All driver's wages paid by Char-Gale to

drivers of tractor-trailer units supplied by LaTuff Transfer were regularly reported under the policy and premiums paid by Char-Gale.

Pertinent Provisions of Part II of the Interstate Commerce Act:

Section 202(a) vests the regulation of the transportation of property and passengers by motor carriers engaged in interstate commerce, as well as the provision of facilities for such transportation, in the Interstate Commerce Commission, 49 U.S.C.A. § 302(a). The section provides: "The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is hereby vested in the Interstate Commerce Commission."

The act defines the term "motor carrier", 49 U.S.C.A. § 303(a)(16), to include carriers covered by the definitions of "common carrier by motor vehicle", 49 U.S.C.A. § 303(a)(14), and "contract carrier by motor vehicle", 49 U.S.C.A. § 303(a)(15).

A common carrier by motor vehicle is prohibited from engaging in interstate commerce unless there is in force a certificate of public convenience and necessity from the Commission authorizing such operations, 49 U.S.C.A. § 306(a).

Every person is prohibited from engaging in the business of a contract carrier by motor vehicle in interstate commerce unless there is in force with respect to such person a permit from the Commission authorizing such operations, 49 U.S.C.A. § 309(a).

The Act, 49 U.S.C.A. § 303(a)(17), defines a private carrier as follows: "The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or

in furtherance of any commercial enterprise."

The "services" and "transportation" to which this part applies are defined, 49 U.S.C.A. § 303(a) (19), as follows: "The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith."

Every common carrier by motor vehicle is required by this act to file with the Commission and keep open to public inspection tariffs showing all the rates and charges for the transportation of property in interstate commerce between points on its routes, and between points on its own routes and points on the route of any other carrier participating in a through route and joint rate, 49 U.S.C.A. § 317(a), and is expressly prohibited from engaging in such transportation without providing such tariff publications, 49 U.S.C.A. § 317(d).

A contract carrier by motor vehicle is prohibited from transporting property in interstate commerce without filing with the Commission and keeping open to public inspection schedules containing the minimum rates and charges of such carrier, 49 U.S. C.A. § 318(a).

The penalty for unlawful operations, 49 U.S.C.A. § 322(a), provides: "Any person knowingly and willfully violating any provision of this chapter, or any rule, regulations, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

In determining whether the lessor of motor vehicle equipment is engaged in transportation subject to regulation under

the Interstate Commerce Act, all services rendered or supplied, and acts performed by the lessor, along with the naked equipment, become of controlling weight in determining the status of the lessor. The amount of this service determines whether the lessor is a "carrier" or is engaged in the private business of operating a truck rental agency.

The District Court in two decisions in this jurisdiction has had before it the practice of truck rental operators and their dealings with shippers in supplying shippers with motor vehicle equipment. Interstate Commerce Commission v. Cheesebrough, D.C., 77 F.Supp. 441 and Interstate Commerce Commission v. F & F Truck Leasing Company, D.C., 78 F.Supp. 13, 20. In the F & F Truck Leasing case, supra, the Court states the controlling tests to be applied to ascertain the status of the lessor to be " * * * when leases are made for the equipment to shippers all acts and service, in addition to supplying a * * * vehicle, become of controlling weight in determining the status of the owner-operator" (lessor).

■ An analysis of the issues in a case of this type is contained in the syllabus to the F & F Truck Leasing case, supra, as follows: "The issue as to whether truck leasing company which purportedly leased vehicles to shippers under single trip written leases was a 'carrier' required to obtain either a certificate of public convenience and necessity as a common carrier or a permit to engage in business of contract carrier would be determined by how much service which goes with ordinary hauling for compensation was being furnished shipper in addition to the leased vehicle, whether on the whole, arrangements between parties indicated that a transportation service was being rendered rather than simply furnishing for private operation a vehicle to shipper, and whether vehicle was being operated by shipper in same manner as would normally obtain if he were owner of the rented equipment."

In the case of Interstate Commerce Commission v. Cheesebrough, supra, the Court approached this feature in stating what the shipper did, quoting from the decision: "The degree of control and direction exercised by Waldorf (shipper) over the operation of the vehicles or the rendition of the motor service was such only as any shipper would normally exercise with respect to carrier service rendered to it by a carrier by motor vehicle, and especially a contract carrier by motor vehicle." [77 F.Supp. 443.]

■ In determining the status of a lessor of motor equipment when vehicles are used by a shipper, the courts have disregarded form, and look only to the substance. As stated by the Circuit Court of Appeals in Georgia Truck System v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, 212: " * * * though its (lessors) operations have been to some extent invested with the form of a renting or hiring business, this investiture is but a device or subterfuge behind and under which appellant, in substance and in reality, operates a transportation business. It is true that the contracts, under cover of which the operations were conducted, are in most of their provisions carefully drawn to give color to appellant's claim of renting only * * *. In the argument much refinement was indulged in, much speculation was raised, many authorities cited, as to how close one might approach the line of transportation without being regarded as having stepped over it. We need not indulge here in any of these refinements. It is sufficient for us to say that the invoked statute is a highly remedial one, that its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of interstate or foreign transportation of property on the public highways for hire * *".

The decisive question to be determined is how much service, if any, in addition to the vehicle alone, may be rendered to the shipper-lessee by the owner-lessor before the borderline between renting and leasing a truck for private carriage is crossed and the broad and all-inclusive field of transportation occupied.

Motor carrier operations must be bona fide and conducted in good faith, without a shadow of subterfuge or attempted evasion of the letter or obligation of the law. Any plan or scheme, whether by purported lease, agency, or other device disguising the true nature of the transportation will be of no avail for that purpose. Where one's object in the transportation of property on public highways is to earn compensation for the use of his equipment and his services, he cannot evade regulation by execution of leases or other agreements which purport to give the alleged lessee the status of a private carrier. Interstate Commerce Commission v. Isner, D.C., 92 F.Supp. 582, 583; Interstate Commerce Commission v. F & F Truck Leasing Company, D.C., 78 F.Supp. 13; Georgia Truck System v. I. C. C., 5 Cir., 123 F.2d 210; Interstate Commerce Commission v. Pickard, D.C., 42 F.Supp. 351; John J. Casale, Inc., Contract Carrier Application, 44 M.C.C. 45, 49 M.C.C. 15; and Bridge Auto Renting Corporation v. Pedrick, 2 Cir., 174 F.2d 733.

Furnishing motor trucks to shippers with drivers selected and employed by the lessor has been in a long line of Commission decisions found to constitute the rendition of a motor truck transportation service subject to Commission regulation. In these cases the Commission found that the lessor, in selecting and furnishing a driver, in fact retained the right to control, direct and dominate the performance of the service. H. B. Church Truck Service Co. Com. Carrier Application, 27 M.C.C. 191, 33 M.C.C. 160; Shields Extension of Operations-Alliance, Ohio, 41 M.C.C. 100; C. E. Hall & Sons, Inc. Contract Carrier Application, 24 M.C.C. 33, 26 M.C.C. 105; John J. Casale, Inc. Contract Carrier Application, 44 M.C.C. 45, 49 M.C.C. 15.

The stipulation of facts states that Hamlet, the driver of the vehicle leased to Char-Gale by LaTuff Transfer, was in the first instance employed as a LaTuff Transfer truck driver along with the several other union drivers attached to LaTuff Transfer's truck leasing service. This driver and the leased vehicle were made available and supplied by LaTuff Transfer to Char-Gale. Selection by lessor of the driver for the leased vehicle has been always held to be a controlling factor in the several cases decided by the Interstate Commerce Commission and establishes a carrier status on the part of LaTuff Transfer.

In the F & F Truck Leasing case, supra, under similar facts the Court issued an injunction to restrain the defendant from performing five separate and distinct courses of action and conduct, any one of which and all of which exceed a service which a shipper-lessee of motor equipment would ordinarily obtain by leasing a vehicle for use as a private carrier, as follows: " * * (a) furnishing motor vehicles for compensation with drivers directly or indirectly selected by it for use of shippers to transport property moving in interstate commerce on public highways; (b) collecting compensation or rent for the operations, service and use of vehicles referred to in (a) on the basis of rates in cents per each 100 pounds of property transported; (c) making single trip one-way leases for motor vehicles to shippers and retaining possession of the vehicle for further leasing to another shipper for a return haul after discharge of the cargo first transported in the leased vehicle at destination; (d) assuming responsibility for the safe delivery of cargoes transported in leased vehicle to shippers and furnishing cargo insurance to them or carrying insurance against claims for damages for the operation of leased vehicles on the highways by shipper-lessees; (e) permitting shipper-lessees of vehicles to pay the drivers' wages of the vehicles furnished and crediting the amount of such wages on the agreed rental for the lease of the vehicle. * * * "

The facts as stipulated in this case are on all fours with three of the courses of conduct and actions held to establish a "carrier" status on the part of the defendant in that case, each one of which were specifically covered by the court's injunction. In the instant case, defendant LaTuff Transfer (a) is furnishing motor vehicles for compensation with drivers directly or indirectly selected by it for use of shippers to transport property moving in interstate

commerce on public highways; (b) collects rental on a truck mile basis (it is a well recognized fact that transportation rates are frequently determined on distance or car mile earnings) and adds up to collecting compensation or rent for the operations, service and use of vehicles on the basis of rates in cents per each 100 pounds of property transported; and (c) is making single trip one-way leases for motor vehicles to shippers and retaining possession of the vehicle for further leasing to another shipper for a return haul after discharge of the cargo first transported in the leased vehicle at destination.

In the recent case of Interstate Commerce Commission v. Isner, D.C., 92 F.Supp. 583, 587, the Court followed the reasoning and tests adopted in cases on this subject in this District in which it said: "The issue of whether a contract carrier status subject to regulation exists is to be determined in each case by how much service which goes with ordinary contract carriage for compensation was being furnished by Isner in addition to the leased vehicles; also whether, on the whole, a transportation service was being rendered by Isner to Valentine, rather than simply furnishing for private operation the vehicles to Valentine, in the same manner as it would normally obtain if it were the owner of the equipment. The facts not only negative such private carriage, but such facts show that Valentine turned over its shipments to Isner in the same manner that it did to regulated carriers herein mentioned, prior to such purported leases, and that it received its transportation for a definite fixed charge which was less than it had previously paid to regulated carriers. Interstate Commerce Commission v. F & F Truck Leasing Co., D.C., 78 F.Supp. 13, 20."

In Georgia Truck System v. I. C. C., 5 Cir., 123 F.2d 210, the court considered a case in which the Georgia Truck System, a corporation, owned by a carrier subject to the Act, purported to lease vehicles to shippers. In that case there was a claim that the drivers were employed by the lessees (shippers) and the contract so provided. It was found that the owner of the vehicles furnished a list of drivers from which lessee could select drivers. In each instance the lessee issued a separate check covering the driver's wages, payable to the drivers or "bearer". That check was forwarded to the lessor (carrier) along with the check covering the amount due to the lessor as owner of the vehicle, but the driver did not receive the proceeds of the check. The check was deposited and collected by the owner of the vehicle. The court in a note summarizing the facts said: "These operations showed that though the contract provided that the lessees should furnish the drivers, they did not do so. In form, appellant furnished a list of drivers from which lessees could select, in fact, the selection was left entirely to, and was made by appellant. The pretense was that the drivers were paid by the shippers, the facts are that the shippers would draw the check payable to a named driver 'or bearer' and would send that along to appellant with a check for the amount due appellant for its charges. The driver was never called upon to endorse the check and appellant with its own check paid his wages for making that trip and for other driving he had done during that period. No control whatever was exercised over the drivers or over the hauling by the shippers, and while one or two of the shippers did pay social security taxes on the wages of some of the drivers, the amounts of such taxes were charged back to Davis Truck Line, and most of the shippers did not even go through this form."

The court concluded from all the facts in evidence that the appellant was in the truck renting business in name only and in the transportation business in truth and in fact.

Defendants in brief contend that LaTuff Transfer did not furnish and control Hamlet, the truck driver, while he was driving the vehicle on the outbound trip which was leased to Char-Gale. This contention is definitely disproved in that LaTuff Transfer first employed Hamlet. Hamlet was attached to and formed a part of LaTuff Transfer's truck rental service, and in addition it cashed, under a power of attorney, the check issued by Char-Gale to Hamlet for his wages. Upon delivery of Char-

Gale's traffic at destination of the one-way trip, Hamlet, acting as agent for LaTuff Transfer, leased the vehicle to carriers or shippers of exempt commoditites for a return revenue haul. Specifically, the stipulation of facts recites: "It (LaTuff Transfer) owned seven tractors and 14 semi-trailers, which said motor equipment is furnished to shippers and other motor carriers as hereinafter related on a one-way trip lease basis. LaTuff Transfer Service, Inc. is a party to the Area Agreement with Drivers' Union, Local 544, and the drivers of the furnished motor equipment are members of said union and wages are paid to the drivers as per the schedule fixed in said agreement. LaTuff Transfer Service, Inc. in conducting its motor rental business employs a number of the union drivers, including one Thane Hamlet." It is clear that Hamlet, from all the circumstances set forth in the stipulation, was at all times the overall employee and agent of LaTuff Transfer, on its payroll, and that LaTuff Transfer could at any time terminate and dispense with his service. Hamlet's purported employment by lessor and lessee constitutes mere form and not substance done only to clothe the relationship of the parties with apparent legality.

Defendants further contend that they furnished only such items in addition to the leased vehicle as they properly could as lessors. The admitted facts prove that LaTuff Transfer is furnishing to Char-Gale a great deal of service in addition to the lease of inanimate tractors and trailers, and in many respects the leased equipment is not operated with the same responsibility as it would be were Char-Gale the owner. In these respects: (1) Char-Gale gets motor equipment fully serviced, plus a furnished and selected driver, with which its property is transported in interstate commerce, for compensation; (2) Char-Gale gets a one-way outbound transportation service from Minneapolis, Minnesota, with no responsibility for the cost of the return of the equipment; (3) Char-Gale is guaranteed a fixed and definite cost for the transportation of its merchandise, 20¢ per truck mile, plus 6¢ per mile for driver's wages, the profit or loss, as the case might be, to inure to or fall on LaTuff Transfer; (4) Char-Gale obtains service of motor equipment without responsibility for collision, upset or fire; (5) Char-Gale receives a transportation service unburdened by the Federal 3% tax on the amount paid for it if the arrangement were to be held to constitute private carriage; (6) Char-Gale obtains a release from all costs of taxes, licenses, fees and costs of operation.

██ As a whole, the arrangement between LaTuff Transfer and Char-Gale is not a lease of bare motor vehicles but when all factors are added together, Char-Gale obtains a motor transportation service. This conclusion is established even though it be conceded that Hamlet is the bona fide joint employee of LaTuff Transfer and Char-Gale in driving the vehicles outbound under the one-way trip leases, which conclusion is not justified when all other factors of the relations between the parties are considered.

The theory advanced by Defendants that Hamlet, the driver of the leased vehicle, automatically becomes the servant and employee of Char-Gale for the duration of the one-way outbound trip lease and reverts back to being the employee and agent of LaTuff Transfer upon the completion of the outbound trip, for further leasing to and driving of the truck for other shippers or carriers, is a fiction employed by the parties to give color and the form of legality to an otherwise unlawful arrangement.

In a well considered case, Wagner v. Larsen, 174 Wis. 26, 182 N.W. 336, 337, the law is stated thus:

"Where an owner hires his team and driver, or his automobile and chauffeur, or his machine and operator to another to do work to be designated and as directed by the hirer, the hirer having no authority by the terms of the contract of hire to discharge the driver, chauffeur, or operator, and substitute another, the driver, chauffeur, or operator remains the servant of the owner in matters relating to the safety and management of the team, automobile, or machine, and the owner is liable to third persons for damages resulting from the negligent management or operation of the

384

team, automobile, or machine by such servant."

"The reason is that the hiring is not of the team distinct from the driver or of the driver distinct from the team, but is the hiring of the entity composed of the two. While the hirer acquires dominion or authority over the entity to designate the work that shall be done and direct the manner of doing it, he acquires no authority to direct how the team shall be driven, managed, or cared for, nor can he divide the entity by separating the driver from the team. He may dispense with the services of the entity—the driver and the team—but he cannot discharge the driver and substitute another."

The joint use of vehicles by two shippers, one shipper using the vehicles northbound and the other shipper using the vehicles southbound, each contributing a proportionate amount to a common fund for cost of operation, has been held to constitute a transportation service requiring Commission authorization in the case of In re Contract Carriers Application of Southern Fruit Distributors, Inc., 31 Motor Carriers Cases 771 (I.C.C.Reports). The pooling together as one entity LaTuff Transfer's motor equipment and service, plus the service and work of Hamlet, creates a completed transportation agency which holds no operating authority from the Interstate Commerce Commission.

The Court agrees with the Government that the so-called leasing arrangement involved in this case, including the asserted joint employment of Hamlet by both lessor and lessee, was in fact a subterfuge and not a bona fide leasing of motor equipment to a shipper for operation by it as a private carrier. The Interstate Commerce Act is a highly remedial statute. Should the furnishing of motor equipment and the additional service here established be held to constitute a lawful relationship between truck owners and shippers, the Interstate Commerce Commission would be precluded from the exercise of that control over motor transportation contemplated by the statute.

The Court finds both defendants, LaTuff Transfer Service, Inc. and Joseph J. LaTuff, guilty on Counts XIV to XVIII, inclusive. Upon defendants' pleas of guilty as to Counts I to VI, inclusive, and Counts XIV to XVIII, inclusive, the Court imposes a general fine of $500.00, payment of which by either defendant to operate as a discharge as to both. Counts VII to XIII, inclusive, may be dismissed on motion of the Government.