**INTERSTATE COMMERCE COMMIS-SION, Plaintiff,**

v.

**SCHULTZ TRANSIT, INC., a corporation, and**
**The J. R. Watkins Company, a corporation, Defendants.**

**Civ. A. No. 563.**

United States District Court
D. Minnesota,
First Division.

Aug. 12, 1957.

Harry F. Horak, Kansas City, Mo., for plaintiff.

Sidney S. Feinberg, of Robins, Davis & Lyons, Minneapolis, Minn., for defendants.

NORDBYE, District Judge.

Plaintiff seeks the issuance of an injunction to restrain defendant Schultz Transit, Inc., from engaging in the

transportation of property by motor vehicle on public highways for compensation without first having obtained a certificate of public convenience and necessity as a common carrier or permit to engage in the business of a contract carrier, as required by the appropriate applicable statutes of the United States. It also seeks the issuance of an injunction to restrain defendant The J. R. Watkins Company, a corporation, from engaging or employing defendant Schultz Transit, Inc., as a common or contract carrier. Defendant Schultz contends that it is engaged in the transportation of exempt agricultural commodities under Section 303(b), Title 49 U.S.C.A., and that the transportations referred to in the complaint are conducted by the Watkins Company as a private carrier of its own merchandise in vehicles leased from Schultz. Watkins makes the same affirmative defense. All parties agree that the only issue before the Court is whether the transportations of the merchandise described in the complaint are common or contract carrier transportation by Schultz or private carriage by defendant Watkins.

There can be no doubt that Watkins and Schultz attempted in a bona fide manner, without any subterfuge or purpose of evasion, to enter into reciprocal lessor and lessee contracts which would meet the approval of the Interstate Commerce Commission and enable Watkins to transport its merchandise as a private carrier. Schultz was a carrier of exempt agricultural products so that it was in a position to lease its trucks to Watkins for use as a private carrier, and when not in use by Watkins, to lease the trucks back from Watkins and carry on its business as an exempt carrier of agricultural products. It was on or about the 24th day of March, 1955, when Watkins entered into a lease agreement with Schultz whereby the latter leased three tractor trailer units for a period of six months, with an automatic renewal provision unless otherwise terminated. The agreement provided that Watkins as lessee would pay 30 cents a mile when the

vehicles were operated by it; that as said lessee it would procure public liability and property damage insurance, but that Schultz would procure collision, upset, fire, theft, and windstorm insurance; that Watkins should not be liable for damage to, or loss of, the vehicles regardless of the cause; that Watkins would use its full-time drivers, who would be under its exclusive jurisdiction, direction and control; that workmen's compensation, social security, and unemployment insurance with reference to the drivers should be paid by Watkins; and that Schultz should maintain the vehicles in first-class operative condition and pay all the necessary fuel, oil and greasing expense when the vehicles were operated by Watkins. On the same day, another lease agreement was entered into between Watkins and Schultz whereby Watkins leased the same vehicles back to Schultz for use by the latter when the vehicles were not needed by Watkins for transportation of its merchandise. Under that lease, Schultz was to pay Watkins 30 cents a mile when the vehicles were operated in the service of or by Schultz; that Schultz was to keep and maintain the vehicles in first-class condition; and that the cost of public liability and property damage during such period or periods would be borne by Schultz. Watkins agreed to furnish Schultz competent drivers, who are to be considered as employees of Watkins, but that Schultz was to reimburse Watkins for the salaries of the drivers, the workmen's compensation expense, and unemployment and social security payments when the vehicles were so used by Schultz. All operation expenses, such as gas, oil and maintenance on the vehicles were to be paid by Schultz. Some changes were made later in the rental to be paid per mile; otherwise the lease agreements remained intact. The drivers were to be paid by Watkins on a per mile basis during the movement of the trucks by either Watkins or Schultz, with Schultz reimbursing Watkins for the drivers' wages, social security, unemployment insurance, and workmen's compen-

sation insurance during the period or periods when the vehicles were used by the owner.

Copies of the proposed leases were submitted to Mr. Hustleby, District Director of the Bureau of Motor Carriers, Interstate Commerce Commission, Minneapolis, some time prior to their execution. On March 14, 1955, Mr. Hustleby directed a letter to the attorney for Schultz Transit, Inc., in which he acknowledged receipt of the two proposed leases, and stated, in part,

"While it is to be understood that the Commission has approved no forms for the lease of vehicles by shippers, in that it is the actual conduct of the parties rather than the written terms of the lease which determines whether a given lease operation is private or for-hire carriage, * * * in operating in strict adherence to the terms and conditions of the lease agreements submitted with your letter aforesaid of March 14th, and in the understanding that Schultz Transit, Inc., as lessee would transport exempt commodities only, * * * so far as I can personally see, and keeping in mind that all operations would be fully subject to the safety regulations of the Commission, the proposed leasing arrangements would be in order under the rulings and decisions of the Commission and the Courts to date."

Later, upon being advised that the proposed equipment leases had been entered into between Watkins and Schultz, Mr. Hustleby under date of March 28, 1955, advised the Watkins Company in part as follows:

"You are advised that on the basis of such equipment leases and in strict adherence to the terms and conditions of such agreements and the applicable provisions of the Motor Carrier Safety Regulations, it would appear that your operations would be of a private carrier character under the rulings and decisions of the Commission and the Courts to date.

"You are further advised that under such above-referred to status your company was on March 15, 1955, certified as a private carrier to the Commission at Washington, D. C. and that under such certification you should shortly be served with the safety regulations by Secretary McCoy."

Under date of March 25, 1955, Secretary McCoy forwarded to the Watkins Company copy of the Motor Carrier Safety Regulations.

The crux of the complaint made by the Commission is that Schultz furnishes the drivers for these vehicles, and therefore Watkins does not have complete supervision, control and direction of these employees within the terms of the leases. Apparently the Commission has concluded that, because Watkins obtains its drivers from the employees of Schultz, it must necessarily follow that Watkins does not have complete control and domination over them. In fact, if Watkins obtained these drivers from its own employees, then counsel for the Commission in the pre-trial conference herein frankly stated:

"* * * if these drivers had been obtained and hired and employed by the Watkins Company without being furnished by the lessor, then I don't think we would be in a position here to contend what we are contending." (P. 22, Pretrial Tr.)

Schultz had been for some years in the transportation business, but his activities were solely confined to that of an exempt carrier, and as such he was not under Part II of the Interstate Commerce Act, except as to safety regulations. At the time the leases were entered into, Schultz intended to continue in that business and use his trucks under lease to Watkins for that purpose whenever Watkins did not need to utilize the trucks for the transportation of its merchandise. Under these circumstances, it was only natural and understandable that in obtaining drivers for the trucks under lease Watkins would look to Schultz,

the owner, for aid and assistance in that regard. Watkins did not have any employees who were qualified to serve as drivers. Moreover, Schultz' employees were experienced over-the-road drivers, with knowledge of the many duties and responsibilities which accompany such employment. It appears that after these leases were entered into and before the Watkins Company used any of these drivers, it required each driver to sign an application for employment with the company and to submit to the necessary physical examination before he was placed on its payroll. Thereafter, the drivers were considered to have the same status as any other employees on the payroll of the company, with the same deductions being made from their salaries for unemployment insurance and social security. Workmen's compensation was carried by Watkins in their behalf. The drivers so employed under the lease arrangement became entitled to vacations with pay and group insurance in the same manner as the other Watkins employees. One Ayshford, a driver under the lease and on Watkins' payroll, received a two weeks' vacation with pay from Watkins after service of one year. A driver by the name of Frankum received one week's vacation with pay from Watkins in 1956. Two other drivers are presently entitled to, and will receive, two weeks' vacation with pay from Watkins. The two weeks' vacation pay is determined by computing the driver's wages at 8 cents a mile from May 1st to May 1st. The total amount is divided by 52 and that product is multiplied by 2. No part of the vacation pay is charged to Schultz.

The primary use which Watkins makes of the trucks it leases, and which use is referred to in the complaint, is to transport merchandise from Winona, Minnesota, where it has its main plant, to Newark, New Jersey, where it has an eastern plant. Transportation of Watkins' merchandise to a less extent also is made in the leased trucks to points in North and South Dakota, Nebraska and Michigan. The leased trucks in question are usual-

ly located in Rochester, Minnesota, some 80 miles from Winona where Schultz has its headquarters. When merchandise of Watkins is to be transported eastbound, for instance, Schultz is notified and the drivers of the trucks are sent to the Winona plant. The drivers reside in various places, including Rochester, Minnesota. Watkins gives the driver instructions, usually in writing and in detail as to routes to be taken, etc., and points of delivery. The trip may involve so-called drop shipments to various places in the East where Watkins has agents. These agents often live off and from any regular highway route, and such trips must at times be made to the home residence of the agent. When the eastbound trip is completed, in most instances Watkins has merchandise, usually from Newark, to be transported westbound, and the vehicle is thus used for a continuous round trip. There are times when Watkins has no merchandise westbound on the return trip. Under such circumstances, Schultz is notified and it arranges for the truck with the same driver to transport exempt agricultural products on the return trip. However, if such commodities are not available for transportation, then Schultz notwithstanding has the responsibility of returning the truck on the return trip. But Watkins pays the drivers both ways and debits Schultz' account for the salaries of the drivers. Schultz' proportionate share of unemployment and social security payments, as well as workmen's compensation, also is charged to it depending upon the mileage that it operates the particular truck.

As indicative of the use of the leased trucks by Watkins, reference may be made to the trips referred to by plaintiff in support of its claim for injunction herein. It appears that the percentage of the mileage used by Schultz on these trips totals 16 per cent and Watkins 84 per cent. For the first six months of 1956, on eastbound and return trips, the mileage of all these trucks is allocated as follows: 96.4 per cent to Watkins and 3.6 per cent to Schultz; on the shipments

to the Dakotas, Nebraska and Michigan, 65.4 per cent to Watkins and 34.6 per cent to Schultz. Moreover, for the entire year of 1956, of the Watkins' mileage on eastern trips, 60 per cent of the merchandise went to Newark, New Jersey, and 40 per cent was transported for so-called drop shipments at various points in the East. The logs of the drivers maintained when the trucks are used either by Watkins or Schultz are forwarded to Watkins. Likewise, the reports of the drivers as to the equipment condition of the trucks are forwarded to Watkins, and if there have been any lapses in that regard, it now appears that Watkins fully complies with the appropriate regulations. The three trailers of the trucks leased from Schultz are completely painted with the inscription "Watkins Products" in large letters, together with other exclusive advertising of Watkins' products painted thereon. The tractors have the inscription on the cab of "Schultz Transit Lines."

If this plan of leasing the trucks to Watkins by Schultz was not bona fide, or if there was some attempt thereby to engage in a mere subterfuge or scheme to evade supervision by the Commission, one might be justified in scrutinizing with great care this arrangement and the practices which may perchance give support to the claim for relief which the Commission makes herein. But there is an absence of support for any such contention. The Commission points out that Watkins obtains motor equipment fully serviced, with no responsibility for the cost of the return of such equipment when it has no merchandise to be transported on a return trip to Winona. Also, it emphasizes that Watkins' cost of transportation is fixed at a specific rate per mile for equipment and driving; that it has no responsibility for the loss of the vehicle by collision, upset, or fire; that it is relieved of the Federal three per cent tax on the amount paid for such transportation which would be collected if the carriage were held to constitute contract carriage. Moreover, it is asserted that, by this arrangement, Watkins is released from the cost of taxes, license fees, and operation expense of the vehicles. However, such benefits and advantages inuring to Watkins under the lease plan were made known to Hustleby before the leases were executed, and there was no contention by him that the private carriage arrangement was vitiated thereby. The Commission does not contend that the terms and conditions of the leases are violative of law per se.

Watkins was confronted with a somewhat unusual problem in the transportation of its merchandise, particularly with reference to drop shipments to various and sundry points in the territory it served. Then, again, there were times when no merchandise was available to be transported back to the Watkins plant at Winona. Watkins apparently tried to solve that problem by a bona fide arrangement with a carrier of exempt agricultural products which had been able to obtain return loads of that nature so as to render the proposed lease arrangement with Watkins a satisfactory one. It is true that where a lessor furnishes employees to a lessee under such an arrangement, the lease plan should be scrutinized with due care in order to determine whether or not it is a bona fide lease arrangement or merely a scheme to evade supervision by the Commission. But under the circumstances disclosed by the evidence here, there is no occasion to overly emphasize the fact that Schultz made its employees available to Watkins under the lease arrangement. As stated heretofore, that was the natural arrangement to be made in light of the situation which existed. Moreover, the fact that these drivers are engaged in looking after the maintenance of these vehicles and in the purchase of gas and oil, and necessarily receive orders from Schultz in regard thereto, does not militate against the bona fides of their status as employees of Watkins. A fair analysis of the entire record persuasively indicates that these drivers are bona fide employees of Watkins and subject to its complete control, domination and

supervision when they are driving these trucks in the transportation of Watkins' merchandise. When the drivers are loaned to Schultz, it is to be expected that orders regarding Schultz' trips are transmitted by the latter.

Concededly, these two concerns have cooperated in attempting to make their venture free from delays and misunderstanding, particularly with respect to merchandise to be transported westbound after Watkins has used the vehicle on an eastbound trip. There may have been occasions when Watkins told the drivers that Schultz would give them the necessary orders as to their return trip. But a common-sense view and analysis of the entire record strongly suggests that the arrangement which was approved by Mr. Hustleby as reflected in the two leases, has been carried out by both parties to the best of their ability and fairly in accordance with the provisions of the two leases. The situation disclosed by the evidence herein is not one that calls for an overly critical or supertechnical appraisal of the conduct of these two defendants in giving orders to the drivers.

The Commission emphasizes the teachings of three cases which have arisen in the District of Minnesota entitled Interstate Commerce Commission v. F. & F. Truck Leasing Co., D.C., 78 F.Supp. 13; Interstate Commerce Commission v. Harvey Cheesebrough, D.C., 77 F.Supp. 441; and United States v. LaTuff Transfer Service, Inc., D.C., 95 F.Supp. 375. However, a reading of these cases readily reflects that the factual situations therein are strikingly different from the facts here. In each of these cases the element of subterfuge and evasion was found to exist in the lease arrangement being considered. The purported private carriage by the lessee was merely one of form and not of substance. In Interstate Commerce Commission v. F. & F. Truck Leasing Co., defendant tacitly conceded under the admitted facts that the

plaintiff was entitled to the injunctive relief which it requested. And in Interstate Commerce Commission v. Cheesebrough, there was no question but that the drivers of the trucks were wholly under the control and domination of the owner of the vehicles. The drivers never were entered as employees upon the employment records of the lessee. There, the evidence was conclusive that the drivers in question were selected by the lessor, paid by the lessor, and were bona fide employees of the lessor. The court in that case stated, p. 442, 77 F. Supp.,

" * * * No part of the compensation paid by Waldorf [the lessee] to Cheesebrough [the lessor] is capable of being identified or segregated as wages."

In the LaTuff case, the owner of the trucks was a signatory to an agreement with the Union of which the drivers in question were members, and there, the employee remained on the payroll of the owner of the vehicle leased during the single trip lease arrangement.

After careful analysis of all the evidence herein, the Court concludes that the record, fairly and reasonably considered, amply justifies a finding that the Commission has not sustained the burden of proof in establishing that when Schultz' trucks are engaged in transporting Watkins' merchandise, the movement is one that comes within the statutory purview of a common or contract carrier. The evidence also fully warrants a finding that Watkins in the transportation of its merchandise and in the fulfillment of the reciprocal leases in question has functioned as a private carrier and that Schultz has not functioned as a common or contract carrier with respect thereto.

Findings of fact and conclusions of law consistent herewith may be submitted upon ten days' notice. An exception is reserved.