Henry E. DRUM et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 8708.

United States District Court
W. D. Oklahoma.

Aug. 15, 1960.

Hanson & Peterson, Oklahoma City, Okl., for plaintiffs.

Charles R. Iden, Akron, Ohio, for intervener Weather-Seal, Inc.

Paul W. Cress, U. S. Atty., Oklahoma City, Okl.; Robert A. Bicks and John J. Voortman, Washington, D. C., for defendant United States.

Robert W. Ginnane, Carroll T. Prince, Jr., and B. Franklin Taylor, Jr., Washington, D. C., for defendant Interstate Commerce Commission.

Roland Rice, Washington, D. C., William T. Brunson, Oklahoma City, Okl., for intervener Regular Common Carrier Conference of the American Trucking Ass'ns, Inc.

Before MURRAH, Circuit Judge, CHANDLER, Chief Judge, and RIZLEY, District Judge.

CHANDLER, Chief Judge.

Plaintiffs instituted this action under 28 U.S.C. §§ 1336, 1398 and Sections 2321 through 2325 to vacate, set aside and annul certain orders of the Interstate Commerce Commission entered in a proceeding initiated by the Commission on its own motion under Section 204(c) of the Interstate Commerce Act (49 U. S.C.A. § 304(c)), and to enjoin the Commission from enforcing or attempting to enforce said orders.

The Commission by order of August 28, 1957, began an investigation under said Section 204(c) of the Act to determine whether the individual plaintiffs, Marion W. Daves, Henry E. Drum, N. C. Newman, A. D. Woodard, George F. Daves, Oscar Daves, Archie Norris, Eugene Wiggins, Charles W. McGee, Todd Shinn and William M. Martin,[1] were engaged in transportation of property in interstate or foreign commerce for compensation as common or contract carriers by motor vehicle, in violation of Part II of the Interstate Commerce Act, and whether the plaintiff Oklahoma Furniture Manufacturing Co. had participated in any such violation. In its report the Commission found that the individual plaintiffs had been and were engaged in transportation of property in interstate commerce for compensation as contract carriers by motor vehicle without appropriate authority in violation of Section 209(a) (1) of the Interstate Commerce Act (49 U.S.C.A. § 309(a) (1)) and entered an order requiring said plaintiffs to cease and desist from all operations found in the report to be unlawful. A petition for reconsideration and exception to said report and order were filed by plaintiffs and denied by the Commission by order of December 29, 1959.

The Regular Common Carrier Conference of American Trucking Associations, Inc. has intervened in this action

---

[1]. Marion W. Daves is no longer employed by Oklahoma Furniture Manufacturing Co. and William M. Martin is now deceased.

in support of defendants' position and Weather-Seal, Inc. has intervened in support of plaintiffs' position.

Oklahoma Furniture Manufacturing Co. (hereinafter referred to as the Company) is engaged in the manufacture of furniture at Guthrie, Oklahoma, which it sells to retail furniture dealers throughout the United States. The Company owns six tractors and seventeen trailers, and in addition to this equipment leases a tractor from each of the individual plaintiffs (hereinafter referred to as owner-operators) under separate lease agreements. All this equipment is used in the interstate transportation of the Company's furniture to retail dealers and in the back-haul of raw materials to the Company. Prior to 1952 the Company carried on all its transportation of goods in company-owned equipment operated by employees of the Company, but upon discovering that the drivers were defrauding it by improper use of credit cards, the Company changed to a system of operation whereby each driver owned and maintained his own tractor, which was leased to the company with the driver being paid on a mileage basis. To effectuate this method of operation, the Company entered into a lease agreement with each driver. These initial leases were subsequently replaced by others which were, in turn, replaced by the present leases with which we are here concerned.

The leases provide in substance as follows: (1) the Company shall pay the owner-operator 10¢ a mile for hauling single-axle trailers and 11¢ a mile for hauling tandem-axle trailers, plus an additional 3¢ a mile for back-haul of the Company's raw materials, (2) payments under the agreement shall be made weekly, (3) motor vehicles covered by the agreement shall be operated by an employee of the Company who shall be properly qualified and physically fit in accordance with state and federal regulations, (4) the owner-operator shall pay all operating costs arising from operation of said equipment (gasoline, oil, grease and parts) and shall pay cost of license plates, (5) the Company shall keep and maintain said equipment in first-class operating condition and in compliance with all safety rules and regulations of state and federal regulatory bodies, (6) if owner-operator fails to pay operating cost of equipment, the Company may cancel the agreement or at its option pay the necessary operating costs and charge same to owner-operator's account with the Company, (7) the Company shall have sole control, right of direction, and use of the leased equipment, all property transported by the leased vehicles shall belong to the Company and the Company will not sublease the equipment to any other person, firm or corporation, (8) the Company shall not be liable for wear, tear and depreciation nor for any damage caused to the leased equipment by accident, theft, fire or any other hazard or casualty, (9) the owner-operator shall not be responsible for loss to company equipment, property and cargo, (10) the Company will have the name of the owner-operator endorsed as an additional assured upon its policies of property damage and public liability insurance covering the operation of motor vehicles, (11) either party may cancel the lease upon giving 30 days' written notice to the other party, (12) the agreement shall remain in full force and effect for one year from date of execution and shall be automatically renewed for further periods of one year unless cancelled in accordance with provisions of the agreement, or terminated by operation of law.

The Company also entered into a union contract as employer of its drivers. The contract covers both drivers of company-owned vehicles and the owner-operators who usually drive their own tractors and who are also treated by the Company as employees. Although all the drivers do not belong to the union, the terms of the contract apply equally to non-union employees. This contract provides, in pertinent part, as follows: (1) the Company may discharge any employee for cause, (2) the owner-operators shall be paid at the rate of 4.5 cents a mile for driving, 0.25 cents a mile for living expenses, and

0.25 cents a mile for labor in the maintenance of the truck, or a total of 5 cents a mile, and shall be paid 6 cents a mile for back-hauls of raw materials, (3) drivers of company-owned tractors shall receive a basic salary of $50 a week plus 2 cents a mile for driving, (4) owner-operators having driven 75,000 miles during a year in which the contract is in effect shall be entitled to vacation pay computed upon the rate of pay for driving and the average weekly mileage in the preceding year, (5) owner-operators shall maintain their trucks in good running condition at all times, (6) owner-operators shall pay their own living expenses while on the road, (7) the provision of the union contract which guarantees employees 6 hours work or pay if they report for work at their usual or regular time shall not apply to owner-operators.

The record made before the Commission shows that the operations of the Company and the owner-operators are in substance carried on in accordance with the provisions of the lease agreements and the union contract, with one exception. The lease agreements provide that the Company shall maintain the tractors of the owner-operators and the union contract provides that the owner-operators shall maintain them. The testimony in the record supports the Commission's finding that the owner-operators in fact maintain their vehicles.

The record also reveals the following: The owner-operators are not authorized by the Interstate Commerce Commission to engage in the transportation of property either as contract carriers or common carriers by motor vehicle in interstate commerce. The Company uses the 6 tractors which it owns chiefly for short hauls and these are usually driven by the salaried company drivers. The tractors leased by the Company are utilized chiefly for long hauls and are usually operated by the owner-operators, each driving his own tractor. It is the practice of the Company to assign the same driver to the same equipment, regardless of whether it is company-owned or leased. However, when necessity or convenience make it more feasible to do so, drivers who usually drive company-owned tractors are assigned to leased tractors and owner-operators to company-owned tractors. All trailers used in the Company's operations are owned by it. A supervisor employed by the Company oversees all drivers, assigns trips and checks to see that all equipment is properly maintained and repaired. Detailed routing instructions are issued to all drivers and compliance therewith is insured by manner of loading, e. g., last goods to come off are loaded first and the first to come off are loaded last. Prior to departure drivers are handed a truck bill manifest which differs from a bill of lading in that the drivers are not required to sign a receipt for the freight they transport. Each owner-operator receives two weekly paychecks, one for rental of his tractor and the other for his service as a driver. The Company deducts from the paychecks of the owner-operators social security and withholding taxes, pays the employer's share of social security and provides workmen's compensation benefits for them. The Company maintains on file drivers' logs, physicians' certificates and vehicle inspection reports. Both company-owned tractors and leased tractors are garaged at the homes of their respective drivers. The Company has the right to hire and fire drivers independently of the lease agreement.

The primary issue presented is whether the interstate transportation operations herein involved constitute private carriage conducted by the Company, or contract carriage on the part of the owner-operators. As the court in Lamb v. Interstate Commerce Commission, 10 Cir., 259 F.2d 358, 360, put it, "Simply stated, it is who was transporting the goods in question," that is, whose operations in interstate transportation were these, those of the Company or those of the owner-operators?

The pertinent statutes involved are as follows: 49 U.S.C.A. § 303(a) (15) provides:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor

vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

49 U.S.C.A. § 303(a) (16) provides:

"The term 'motor carrier' includes both a common carrier by motor vehicle and a contract carrier by motor vehicle."

49 U.S.C.A. § 303(a) (17) provides:

"The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee. when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

49 U.S.C.A. § 304(c) provides:

"Upon complaint in writing to the Commission by any person, State board, organization, or body politic, or upon its own initiative without complaint, the Commission may investigate whether any motor carrier or broker has failed to comply with any provision of this part, or with any requirement established pursuant thereto. If the Commission, after notice and hearing, finds upon any such investigation that the motor carrier or broker has failed to comply with any such provision or requirement, the Commission shall issue an appropriate order to compel the carrier or broker to comply therewith. Whenever the Commission is of opinion that any complaint does not state reasonable grounds for investigation and action on its part, it may dismiss such complaint."

49 U.S.C.A. § 309(a) (1) provides in part:

"Except as otherwise provided in this section and in section 310a of this title, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business * * *"

49 U.S.C.A. § 42 provides:

"In any proceeding for the enforcement of the provisions of the statutes relating to interstate commerce, whether such proceeding be instituted before the Interstate Commerce Commission or be begun originally in any district court of the United States, it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the rate, regulation, or practice under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."

The parties appear to be in some slight disagreement as to the scope of judicial review of an order of the Commission. The defendants contend that "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 694, 78 L.Ed. 1260. They further contend that the court can only

determine whether or not the Commission's findings are supported by substantial evidence. Riss & Co., Inc. v. United States, D.C.W.D.Mo., 100 F.Supp. 468, affirmed 342 U.S. 937, 72 S.Ct. 559, 96 L.Ed. 697, rehearing denied 343 U.S. 937, 72 S.Ct. 769, 96 L.Ed. 1344. Plaintiffs, on the other hand, state that a reviewing court when passing on the validity of a Commission order should ascertain whether it is supported by *substantial evidence on the record considered as a whole.* Coyle Lines v. United States, D. C.E.D.La., 115 F.Supp. 272. While this court recognizes the distinction emphasized in the latter case, it nevertheless feels that even under the rule as set forth by defendants a reviewing court will consider the whole record in determining whether there is substantial evidence to support such an order.

■ Plaintiffs allege that the Commission was without jurisdiction to initiate its investigation into the operations of plaintiffs for the reason that it proceeded under 49 U.S.C.A. § 304(c) which only authorizes it to investigate motor carriers and brokers and that since the term "motor carrier" includes only common carriers and contract carriers, the Commission had no authority to investigate the operations of the Company because it is a shipper and a private carrier. In view of the fact that 49 U.S.C.A. § 303(c), 49 U.S.C.A. § 306(a) (1) and 49 U.S.C.A. § 309(a) (1) prohibit any person from engaging in operations as a common carrier or contract carrier without an appropriate certificate or permit issued by the Commission and that 49 U.S.C.A. § 304(c) authorizes the Commission to investigate whether any motor carrier has failed to comply with any provision of Part II of the Act, and after notice and hearing, to issue any appropriate order to compel compliance, it necessarily follows that the Commission has the right, power and duty to inquire into operations such as those involved here to ascertain whether persons are in fact carrying on common carrier or contract carrier operations in violation of the Act. It is therefore evident that the Commission had jurisdiction as regards the owner-operator plaintiffs and 49 U.S. C.A. § 42 granted the Commission authority to join the Company.

■ In reaching its decision on the primary issue herein involved, the Commission utilized two tests: (1) Did anyone other than the Company have any right to control, direct and dominate the transportation involved, and (2) Were the owner-operators in substance engaged in the business of interstate or foreign transportation of property on the public highways for hire. Both tests have been approved by the courts. See Interstate Commerce Commission v. F & F Truck Leasing Co., D.C.Minn., 78 F. Supp. 13, 20, where the court stated:

> "In order for the operations to be those of the shipper as a private carrier there must be a clear and unequivocal showing that the shipper exercises control and responsibility over the operations of the vehicle, such as would be exercised by it if it were the owner of the vehicle."

See also Interstate Commerce Commission v. Gannoe, D.C.W.D.Pa., 100 F.Supp. 790; Motor Haulage Co. v. United States, D.C.E.D.N.Y., 70 F.Supp. 17, affirmed 331 U.S. 784, 67 S.Ct. 1205, 91 L.Ed. 1815; United States v. La Tuff Transfer Service, D.C.Minn., 95 F.Supp. 375. In regard to the second test mentioned, see Georgia Truck System Inc. v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210; Lamb v. Interstate Commerce Commission, supra; A. W. Stickle Co. v. Interstate Commerce Commission, 10 Cir., 128 F.2d 155, certiorari denied 317 U.S. 650, 63 S.Ct. 46, 87 L.Ed. 523.

In addition to these tests the Commission also relied upon a rebuttable presumption (which defendants state is essentially an inference) set forth by the Commission in H. B. Church Truck Service Co., Common Carrier Application, 27 M.C.C. 191, as follows:

> " * * * in cases in which the question of the status created by a lease of equipment with drivers by a carrier to a shipper is presented, in

the absence of a showing to the contrary, the presumption arises that the transportation is performed by the carrier for compensation, in other words is for-hire transportation and as such is subject to regulation."

This "presumption" has been indirectly recognized by the courts. See Motor Haulage Co. v. United States, supra, and Interstate Commerce Commission v. Gannoe, supra. It will be noted, however, that in the above cited Church decision the Commission stated that the presumption arises only "in the absence of a showing to the contrary," and that "This presumption will, of course, yield to a showing that the shipper has the exclusive right and privilege of controlling the transportation service, * * *" The Commission in that decision further stated:

"The question as to who has the right to control and direct must be answered in the light of all the facts and circumstances surrounding the transaction between the carrier and shipper, and of the actual practices in the conduct of the operation thereunder. No element of such facts and circumstances is by itself controlling."

The Commission in the instant proceeding in effect made the presumption irrebuttable and repudiated its decision in the Church case by the following declaration:

"There is present, whenever the owner-operator drives his own equipment, the right and power of the lessor to defeat any supposed right to control that the shipper-lessee may believe exists."

This is true unless, of course, the Commission formulated a new rule, thinking, as this court is inclined to think, that this situation does not technically justify application of the presumption because it is not one involving "a lease of equipment with drivers by a carrier to a shipper," but a lease of equipment alone with the drivers to be supplied by the Company. In any event, the court does not

agree with the reasoning of the Commission that the quoted conclusion necessarily follows.

The record before the Commission discloses that there was more than sufficient evidence to rebut any presumption or inference of transportation for-hire. The Company had the right to, and actually did control, direct and dominate the transportation of its products and the equipment and personnel concerned therewith. The owner-operators were not in substance engaged in the business of transportation for-hire, but were merely employees of the Company and were so considered by both the Company and themselves.

■ As is urged by defendants, substance, not form, should be the governing factor in determining whether these operations constituted transportation for-hire on the part of the owner-operators. United States v. La Tuff Transfer Service, supra; Georgia Truck System, Inc. v. Interstate Commerce Commission, supra. In the instant case both the form and the substance of the arrangements as revealed by the lease agreements, union contract and actual operations, clearly point to the fact that what is involved here is private carriage on the part of the Company, rather than transportation for-hire by the owner-operators. The Company dominates and controls the transportation in question just as it did prior to the inauguration of the leasing arrangements. The change in form alone did not change the substance of the Company's operations. The same degree of control is exercised by the Company over the operations of the owner-operators as is exercised over those of drivers of company-owned vehicles.

Defendants contend that there are three aspects of this transportation which the owner-operators retained a right to control. First, it is alleged that since the owner-operators are responsible for the maintenance of their own vehicles, they have the right to decide where and what kind of repairs are to be made. The testimony before the

Commission shows that Company personnel oversee maintenance and repairs of all equipment used by the Company; that the owner-operators have to meet the requirements of the Company as to state of repair and that their equipment is checked by Company personnel periodically to ascertain whether it meets certain requirements and whether specified repairs have been made. There is, therefore, no real control over maintenance exercised by the owner-operators. Second, defendants point out that the owner-operators garage their tractors at their homes and that they could use them for their own purposes and could even haul for others. Since drivers of company-owned vehicles also garage the vehicles they drive at their homes, no element of control appears by virtue of the fact that the owner-operators have that right. And, it appearing that the owner-operators are on call at all times to haul Company goods, it is far-fetched to speculate that they might possibly breach their lease agreements in order to haul for someone else. There is no evidence of any of them ever having done so. Third, defendants contend that the owner-operators retain considerable right to control their vehicles while driving them for the Company and that there is a possibility of a conflict of interest, say in a situation where an owner-operator might have to choose between stopping immediately to make repairs, thereby arriving late with a shipment, or continuing at the risk of incurring more expensive repairs. All drivers have some independent decisions to make, and as to *possible* areas of conflict, these are *conjectural only* and not of such stature as to constitute an element of control on the part of the owner-operators.

As was pointed out in the dissent to the Commission report, and the statement is equally applicable here, the cases most heavily relied on by the Commission to support its order involve a person or firm owning equipment, employing drivers and making both available to the lessee, or in some cases, to several lessees. The facts here are materially different. In addition, in each of the cases relied on by defendants, there was some element of control long considered important by the courts and the Commission which was retained by the lessor; or there were some duties which ordinarily fall on the carrier, private or otherwise, which were assumed by the lessor or no one.

■ Upon consideration of the record, the court concludes that the findings of the Commission are not supported by substantial evidence. For that reason the cease and desist order entered against the owner-operators must be set aside. Judgment will be entered accordingly.