INTERSTATE COMMERCE COMMISSION
v. GANNOE et al.

Civ. A. No. 8921.

United States District Court
W. D. Pennsylvania.

Oct. 3, 1951.

John A. Dunning, Columbus, Ohio, Irwin A. Swiss and Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., for the plaintiff.

Sherman T. Rock, of Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Charles D. Johnson, of Baker, Hostetler & Patterson, Cleveland, Ohio, for the defendant.

MARSH, District Judge.

This suit is brought under provisions of Part II of the Interstate Commerce Act,[1] and particularly Section 222(b)[2]. The Interstate Commerce Commission asserts that the defendant, Clarence E. Gannoe, is a common or contract carrier by motor vehicle as these terms are defined in the Act; and, since he does not have a certificate or a permit issued by the Commission authorizing such operations, the Commission requests that he should be enjoined from transporting property in interstate commerce for compensation.

After final hearing, the court is of the opinion that the request should be granted and that the injunction should issue.

From June, 1949, to September 30, 1949, the defendant, Gannoe, for compensation, transported property owned by Cozier Container Corporation (hereinafter referred to as Cozier), in interstate commerce, in vehicles owned by the defendant, pursuant to the terms of a "Lease Agreement" then in effect between the parties.

Gannoe resided in Erie, Pennsylvania. Cozier operated a box manufacturing plant in Jefferson, Ohio. Although it owned trucks of its own, the company required additional transportation facilities, as it was inconvenient to engage common carriers to transport its product to customers in Cleveland, Ohio, Erie, Pennsylvania, and Jamestown, New York. The "Lease Agreement," which was dated September 14, 1948, purported to lease a tractor and trailer truck to Cozier "with no other obligation of any kind" except to pay as rent certain sums per ton transported to the above-mentioned cities. The agreement states: "The lessor agrees that he will deliver and transport the products of the lessee * * * at the di-

rection of the lessee * * *." It provided for renewable terms of three months each unless cancelled by a thirty day written notice from either party.

It does not seem to be seriously disputed that this arrangement was a violation of the Interstate Commerce Act, Section 209 (a),[3] and when objections were made by an agent of the Interstate Commerce Commission, the defendant sought counsel who prepared a new agreement called an "Equipment Lease," which was executed by defendant and accepted by Cozier on October 1, 1949. This agreement was in effect between the parties up to and including the time of the trial on April 2, 1951. It provides as follows:

"Equipment Lease

"The undersigned hereby agrees to furnish Cozier Container Corporation with the motor vehicle equipment identified below or with such other motor vehicle equipment of at least the same size and capacity as may be substituted therefore [sic], from the date of this agreement until said agreement is terminated by the delivery of written notice by either party to the other at least three (3) days prior to such proposed termination and cancellation. The undersigned agrees that he will assume full and complete responsibility for the maintenance and repair of said motor vehicle equipment and will maintain it in good operating condition at all times, including compliance with all safety and other applicable requirements of the Interstate Commerce Commission and of each state entered.

"The undersigned agrees that he will indemnify and save harmless Cozier Container Corporation from any and all claims for damages caused by or arising out of any defect in said equipment or any failure to comply with any of the foregoing requirements and further agrees that he will at all times maintain in full force and effect public liability and property damage insurance in an insurance company and in limits satisfactory to said Cozier Container Corporation and that he will cause said

1. 49 U.S.C.A. Chapter 8, § 301 et seq.

2. 49 U.S.C.A. § 322(b).

3. 49 U.S.C.A. § 309(a)..

Corporation to be named as an additional interest in all of such policies and that the insurance companies will furnish Cozier Container Corporation notice of any material change or condition ten (10) days prior to the effective date, if any such change.

"Cozier Container Corporation will pay to the undersigned as full consideration for the use, maintenance, and cost of operation of said equipment the respective amounts set forth on Schedule A, attached hereto and made a part hereof. It is understood and agreed that the drivers engaged in the operation of such equipment shall be employees of Cozier Container Corporation and shall be subject to its direction and control. The undersigned further agrees that the wages paid to said drivers plus any payroll taxes or workmen's compensa-tion insurance paid thereon may be deduct-ed by Cozier Container Corporation from the amounts due to him hereunder as computed in accordance with the attached Schedule A. The undersigned further authorizes Cozier Container Corporation to deduct from any sum due him hereunder any expenditure made by it or on its behalf for the maintenance, repair, or servicing of said equipment and any and all damages to any property owned by said Corporation, which may be caused by or result from any defect in said equipment.

"Accepted:

"Cozier Container Corporation

"By /s/ E. D. Elderkin

"/s/ C. E. Gannoe
C. E. Gannoe
Cleveland, Ohio
October 1, 1949"

"FREIGHT RATES

to Apply on Attached Contract
From Jefferson, Ohio

| Destination | Commodity | Rates | Signatures |
| --- | --- | --- | --- |
| Cleveland, Ohio | Watkins and Corru-gated Boxes | $29.00 | H. R. Trees and C. E. Gannoe |
| Erie, Penna. | Watkins and Corru-gated Boxes | 29.00 | H. R. Trees and C. E. Gannoe |
| Erie, Penna. | Skid Boards | 29.00 | H. R. Trees and C. E. Gannoe |
| Corry, Penna. | Watkins Boxes | 30.00 | H. R. Trees and C. E. Gannoe |
| Jamestown, N. Y. | Watkins Boxes | 36.00 | H. R. Trees and C. E. Gannoe |

1 Dodge 3-ton Tractor
1 Dodge 2½-ton Tractor
2 32-ft. Closed Freuhauf Trailers"

Although the new agreement differs in several details from the old, the most singular changes are the provisions that "It is understood and agreed that the drivers engaged * * * shall be employees of Cozier"; that they shall be subject to its direction and control; and that their wages, plus any payroll taxes or workmen's compensation insurance paid thereon may be deducted by Cozier from the compensation due to defendant.

The evidence is to the effect that Cozier directed and controlled the drivers of the equipment to the extent that its factory manager instructed them when and where to deliver its product. Gannoe himself was one of the drivers and the other driver, Reynolds, was selected by Gannoe and introduced to Cozier for employment. Although the wages of the drivers were paid directly to them by Cozier, the amount thereof was deducted from the compensation due to Gannoe. In a similar manner Gannoe actually paid the premiums for workmen's compensation insurance, social security and withholding taxes. Reynolds, however, was not regularly in the exclusive, full-time employment of Cozier, but was also employed by Gannoe to service the equipment. Gannoe paid Reynolds direct-

ly for this work. It seems that Reynolds was the joint employee of both Cozier and Gannoe since each paid him for different phases of the work, but in a real sense Gannoe paid all the wages. It is to be observed that the agreement does not expressly give Cozier the right to discharge the drivers employed. In view of the three-day cancellation clause contained therein, any implied right to discharge the driver who owns the equipment and the drivers selected by said owner would be illusory. From these facts we conclude that the defendant had greater control over Reynolds than did Cozier.

█ It is not clear who directed and controlled the actual operation of the vehicles on the highways or to whom Reynolds reported in case of emergency. There is a strong presumption[4] that Gannoe, the owner-driver, controlled the operation and care of the tractor-trailer which he drove. Presumably Reynolds would report in case of emergency to Gannoe, since it was he, rather than the shipper, who carried the liability insurance, cared for and maintained the equipment, and assumed the responsibility for the cargo.[5] Since the defendant performed so many of the services generally performed by contract carriers and because he had the greater control over Reynolds, a strong inference arises that he retained authority to direct the manner in which his equipment should be cared for, driven and managed. In the opinion of the court, he dominated the actual operation of the trucks on the road.

The testimony of Gannoe and the factory manager to the effect that Cozier completely directed and controlled the operation of said vehicles amounts to no more than unwarranted conclusions and has little weight in view of the facts. Unless these conclusions are to be given the standing of ultimate facts, usually to be found by the court, the inference to be drawn from the evidence points to control by the defendant over every phase of the transportation services except the normal directions given to any contract carrier by a shipper.

The evidence also disclosed that defendant defrayed the costs of maintenance, gasoline and oil, and, as called for in the agreement, complied with the safety regulations of the Interstate Commerce Commission. Although Cozier had possession of the drivers' logs as is required of a motor carrier by the regulations, it appeared that the company did not have in its files the health certificates required for the drivers.[6]

The schedule of "Freight Rates" attached to the equipment lease of October 1, 1949, expresses the minimum compensation to be paid to Gannoe for each trip. The compensation includes payment for the return trip to Jefferson, Ohio, which, at least since October 1, 1949, is usually made without cargo. The real rates, however, for each trip are based on a certain sum per 100 pounds; for example, for a trip to Erie the rate is 29¢ per 100 pounds, and to Jamestown, New York, the rate is 36¢ per 100 pounds. Compensation calculated in this manner, based as it is upon the weight of the goods transported, resembles charges for transportation rather than rental for the use of vehicles.

4. When drivers are supplied by the owner of the equipment, the presumption is that the owner dominates the operation. See John J. Casale, Inc., 44 M.C.C. 45; H. B. Church Truck Service Co., 27 M.C. C. 191; Shields Extension of Operations-Alliance, Ohio, 41 M.C.C. 100.

5. Although Gannoe under the "Equipment Lease" was liable only for cargo damage due to defects in the equipment, it seems undisputed that he carried the cargo insurance and Cozier did not carry cargo insurance. Cf: Georgia Truck System

Inc. v. Interstate Commerce Commission, 5 Cir., 1941, 123 F.2d 210, Footnote 3.

6. 49 C.F.R. Sec. 192.3: "On and after January 1, 1940, *every motor carrier shall have in his files* a certificate of physical examination signed by a qualified doctor of medicine for every new driver entering the motor carrier's employment, attesting that the doctor has examined said driver and found him to meet satisfactorily the qualifications set forth in 192.2(a)–(c)." (Emphasis added). A "motor carrier" includes a private carrier. See 49 U.S.C.A. Sec. 304(a) (3).

The two tractors used were painted with the words "Cozier Container Corporation." There seemed to be three trailers in use. When not enroute the trailers were parked on the property of Cozier for loading. Gannoe, when off duty, drove a tractor to his home.

Defendant contends that under the foregoing facts Cozier, the shipper, is a bona fide private carrier and he is simply and strictly its employee. With this contention the court cannot agree, since it is apparent that Cozier received a transportation service rather that a bare lease of vehicles.

■ Motor carrier operations must be conducted in good faith without a shadow of subterfuge or attempted evasion of the letter or obligation of the law. The Act is highly remedial and should be liberally construed to carry out its expressed policy and purpose of securing uniformity in rates without unfair or destructive competitive practices.[7] Its terms are sufficiently comprehensive to include all of those who, no matter what form they use, are in substance engaged in the business of interstate transportation of property on the public highways for hire: Georgia Truck System, Inc. v. Interstate Commerce Commission, 5 Cir., 1941, 123 F.2d 210, 212. See also: McDonald v. Thompson, 1938, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164; Piedmont and Northern Ry. v. Interstate Commerce Commission, 1932, 286 U.S. 299, 311, 52 S.Ct. 541, 76 L.Ed. 1115; Interstate Commerce Commission v. Isner, D.C.E.D.Mich., S.D.1950, 92 F.Supp. 582, 587; United States v. La Tuff Transfer Service, D.C.Minn.1950, 95 F.Supp. 375; Interstate Commerce Commission v. F & F Truck Leasing Co., D.C.Minn.1948, 78 F. Supp. 13. A plan or scheme which disguises the true nature of the transportation is of no avail. Gannoe's intention was to earn compensation for the use of his equipment and services in transporting the products of the shipper over the public highways in interstate commerce. His first attempt to give the shipper the status of a private carrier is clearly a subterfuge; the second attempt, under an artfully drawn agreement, is simply a better disguise; his intention remained the same.

■ The court is of the opinion that the defendant dominated the performance of the transportation services rendered the shipper in this case and that these services, in addition to supplying the vehicles involved, were those of a contract carrier in transporting property in interstate commerce for compensation, and are subject to regulation under the Act.

---

7. See national transportation policy set forth in the amendatory Act of Sept. 18, 1940, Chapter 722, Title 1, § 1, 54 Stat. 899, 49 U.S.C.A., note preceding section 301.