UNITED STATES ET AL. *v.* DRUM ET AL.

No. 23.   Argued October 11–12, 1961.—Decided January 15, 1962.*

*Together with No. 24, *Regular Common Carrier Conference of American Trucking Associations, Inc.,* v. *Drum et al.,* also on appeal from the same Court.

*Robert W. Ginnane* argued the cause for appellants in No. 23. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Loevinger, Richard A. Solomon* and *B. Franklin Taylor, Jr.*

*Roland Rice* argued the cause and filed briefs for appellant in No. 24.

*William L. Peterson, Jr.* and *Charles R. Iden* argued the cause for appellees in both cases. With them on the briefs was *Walter D. Hanson.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In an investigation initiated by it under 49 U. S. C. § 304 (c),[1] the Interstate Commerce Commission held that appellees who leased their motor vehicles and hired

---

[1] Interstate Commerce Act § 204 (c), 49 Stat. 547, as amended, 49 U. S. C. § 304 (c):

"Upon complaint in writing to the Commission by any person, State board, organization, or body politic, or upon its own initiative without complaint, the Commission may investigate whether any motor carrier or broker has failed to comply with any provision of this chapter, or with any requirement established pursuant thereto. If the Commission, after notice and hearing, finds upon any such investigation that the motor carrier or broker has failed to comply with any such provision or requirement, the Commission shall issue an appropriate order to compel the carrier or broker to comply therewith. Whenever the Commission is of opinion that any complaint does not state reasonable grounds for investigation and action on its part, it may dismiss such complaint."

their services as drivers to the appellee Oklahoma Furniture Manufacturing Company (hereinafter "Oklahoma") were contract carriers within 49 U. S. C. § 303 (a)(15) [2] and subject to the permit requirements of 49 U. S. C. § 309 (a)(1).[3]   79 M. C. C. 403.

[2] Interstate Commerce Act § 203 (a) (15), 49 Stat. 544, as amended, 49 U. S. C. § 303 (a)(15):

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this section and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Interstate Commerce Act § 203 (a) (14), 49 Stat. 544, as amended, 49 U. S. C. § 303 (a)(14), defines "common carrier" as follows:

"The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to chapter 1 of this title, to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to chapter 1 of this title."

[3] Interstate Commerce Act § 209 (a) (1), 49 Stat. 552, as amended, 49 U. S. C. § 309 (a)(1):

"Except as otherwise provided in this section and in section 310a of this title [exceptions not here pertinent], no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business . . . ."

See also Interstate Commerce Act § 203 (c), 71 Stat. 411, as amended, 49 U. S. C. § 303 (c):

"Except as provided in section 302 (c) of this title, subsection (b) of this section, in the exception in subsection (a)(14) of this section,

A three-judge court in the District Court for the Western District of Oklahoma, convened under 28 U. S. C. § 2325 in a proceeding commenced by appellees pursuant to 28 U. S. C. §§ 1336 and 1398,[4] set aside the cease-and-desist order by which the Commission required the lessors to refrain from their operations unless and until they received appropriate authority therefor from the Commission. 193 F. Supp. 275. The District Court held that Oklahoma was engaged in private carriage as defined in 49 U. S. C. § 303 (a)(17).[5] We noted probable jurisdiction of the appeals lodged here under 28 U. S. C. § 1253. 365 U. S. 839.

The Motor Carrier Act of 1935[6] subjected many aspects of interstate motor carriage—including entry of

and in the second proviso in section 306 (a)(1) of this title [none of which exceptions are here pertinent], no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign commerce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation, nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person."

[4] The United States intervened as defendant, 28 U. S. C. § 2322, and appellee Weather-Seal and appellant Regular Common Carrier Conference intervened as plaintiff and defendant respectively, 28 U. S. C. § 2323.

[5] Interstate Commerce Act § 203 (a)(17), 49 Stat. 545, 49 U. S. C. § 303 (a)(17):

"The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

[6] 49 Stat. 543–567, as amended, 49 U. S. C. §§ 301–327.

persons into the business of for-hire motor transportation
and the oversight of motor carrier rates—to administra-
tive controls, on the premise that the public interest in
maintaining a stable transportation industry so required.[7]
However, although aware that "Both [contract carriers
and common carriers] . . . are continually faced with
actual or potential competition from private truck opera-
tion . . . ,"[8] Congress took cognizance of a shipper's
interest in furnishing his own transportation,[9] and limited
the application of the licensing requirements to those
persons who provide "transportation . . . for compensa-
tion"[10] or, under a 1957 Amendment, "for-hire transpor-
tation."[11]   The Commission, therefore, has had to decide
whether a particular arrangement gives rise to that "for-
hire" carriage which is subject to economic regulation in
the public interest, or whether it is, in fact, private car-
riage as to which Congress determined that the shipper's
interest in carrying his own goods should prevail.   This
case is a recent instance of the Commission's developing
technique of decision.

From the beginning underlying principles have been,
and have remained, clear.   A primary objective of the
scheme of economic regulation is to assure that shippers
generally will be provided a healthy system of motor
carriage to which they may resort to get their goods to
market.   This is the goal not only of Commission sur-

---

[7] See S. Rep. No. 482, 74th Cong., 1st Sess. 2; H. R. Rep. No.
1645, 74th Cong., 1st Sess. 3; S. Doc. No. 152, 73d Cong., 2d Sess.
14–15, 22–23 (Report of Federal Coordinator of Transportation on
the Regulation of Transportation Agencies).

[8] *Id.*, at 14.

[9] See S. Rep. No. 482, 74th Cong., 1st Sess. 1; H. R. Rep. No. 1645,
74th Cong., 1st Sess. 4; H. R. Doc. No. 89, 74th Cong., 1st Sess. 17
(Report of Federal Coordinator of Transportation on Transportation
Legislation).

[10] See notes 2, 5, *supra.*

[11] See note 3, *supra.*

veillance of licensed motor carriers as to rates and services, but also of the requirement that the persons from whom shippers would purchase a transportation service designed to meet the shippers' distinctive needs must first secure Commission approval. See *Contracts of Contract Carriers*, 1 M. C. C. 628, 629; *Keystone Transportation Co.*, 19 M. C. C. 475, 490–492. The statutory requirement that a certificate or permit be issued before any new for-hire carriage may be undertaken bespeaks congressional concern over diversions of traffic which may harm existing carriers upon whom the bulk of shippers must depend for access to market.[12] Accordingly, the statutory definitions, while confirming that a shipper is free to transport his own goods without utilizing a regulated instrumentality, at the same time deny him the use of "for compensation" or "for-hire" transportation purchased from a person not licensed by the Interstate Commerce Commission. Because the definitions must, if they are to serve their purpose, impose practical limitations upon unregulated competition in a regulated industry, they are to be interpreted in a manner which transcends the merely formal. From the outset the Commission has correctly interpreted them as importing that a purported private carrier who hires the instrumentalities of transportation from another must—if he is not to utilize a licensed carrier—assume in significant measure the characteristic burdens of the transportation business. The problem is one of determining—by reference to

---

[12] See S. Doc. No. 152, 73d Cong., 2d Sess. 33 (Report of Federal Coordinator of Transportation on the Regulation of Transportation Agencies). That concern has found recent legislative expression in a 1958 amendment designed to curb so-called "buy-sell" evasions by purported or "pseudo" private carriers. 72 Stat. 568, 574, amending the Interstate Commerce Act § 203 (c), 49 U. S. C. § 303 (c). See S. Rep. No. 1647, 85th Cong., 2d Sess. 23–24; H. R. Rep. No. 1922, 85th Cong., 2d Sess. 17–19.

the clear but broad remedial purpose of a regulatory statute committed to agency administration—the applicability to a narrow fact situation of imprecise definitional language which delineates the coverage of the measure. Private carriers are defined simply as transporters of property who are neither common nor contract carriers; and the statute will yield up no better verbal guide to the reach of its licensing provisions than transportation "for compensation" or "for-hire." Compare *Bates & Guild Co.* v. *Payne,* 194 U. S. 106; *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 144–146; *Gray* v. *Powell,* 314 U. S. 402, 412–413; *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 130–131. Because the Commission's resolution of the issue does not seem to us to violate the coherence of the body of administrative and judicial precedents so far developed in this area, we are of the opinion that there was no occasion for the District Court to disturb the conclusion reached by the Commission. We therefore reverse the District Court's judgment.

It was a wish to rid itself of certain burdens of its existing transportation operation which caused Oklahoma to enter into the arrangement here involved. Prior to 1952 Oklahoma, a manufacturer of low-cost furniture, had maintained a full fleet of tractors and trailers in which all its furniture was shipped. A full crew of drivers was employed. Oklahoma absorbed all the expenses, and carried all the risks, of its transportation operation. It utilized a system of delivered pricing which eliminated transportation charges as an identifiable element of the price of its furniture. Its status as a private carrier exempt from licensing requirements was never questioned under the pre-1952 arrangement. But that method of operation was found to incorporate certain burdensome disadvantages. Oklahoma discovered that its employee-drivers were embezzling its funds through the misuse of

credit arrangements which the company had established for the purchasing of fuel and minor repairs on the road. In addition, Oklahoma became convinced that its equipment was too often involved in accidents, and too often in need of repairs and maintenance which could have been avoided by careful operation.

In an effort to eliminate these disadvantages, Oklahoma in 1952 altered its *modus operandi*. It decided to terminate its investment in tractors for long hauls and, instead, to lease them from the drivers. The original lease agreements encountered difficulty when, in 1956, the Supreme Court of Arkansas held that the resultant operation constituted for-hire carriage by the owner-operators which required licensing under the applicable Arkansas statutes.[13] Following this turn of events, Oklahoma revised the leases, and also entered into a collective agreement with the union representing its workers setting forth the terms under which the owner-operators were to be employed as drivers. The current lease and collective agreement provide the factual predicate of the present litigation.

The Company presently owns 26 trailers and 6 tractors. It leases 11 tractors for long-haul use in connection with the trailers which it owns. It is solely in connection with the 11 leased tractors and the services of their owner-operators that the Commission discerned the provision of for-hire transportation. The leases are for renewable terms of one year, but they are terminable by either party on 30 days' notice. Oklahoma is granted the sole right to control the use of the tractor through drivers employed by it; in return, it covenants that such use will be lawful and will be confined to the transportation of the Company's property. Oklahoma pays for its

---

[13] *Robinson* v. *Woodard*, 227 Ark. 102, 296 S. W. 2d 672.

use of the tractors strictly on a mileage basis. The owner receives weekly rental payments of 10 or 11 cents for each mile the vehicle is driven, plus an extra 3 cents per mile on the backhaul if there is a load of raw materials. Oklahoma does not guarantee any minimum mileage. Operating costs—including gasoline, oil, grease, parts, and registration fees—are paid by the owners. Oklahoma assumes no responsibility for wear and tear or damage to the tractors, nor does it provide collision or fire and theft insurance coverage—although it does pay for public liability and property damage insurance. The owners assume no responsibility to Oklahoma for damage to the cargoes.

Under the collective agreement covering the drivers among its employees, the drivers enjoy certain common employment privileges such as collective bargaining, seniority rights, death benefits, immunity from discharge except for cause, military-service protection, and vacation pay in an amount based on their average weekly pay. Owner-drivers may be discharged for cause.[14] Their remuneration is calculated strictly on a mileage basis, and they are obliged to pay their own living expenses while on the road. No minimum weekly pay or mileage is guaranteed.[15] Drivers are required to maintain their trucks in good running condition at all times.

Oklahoma's actual operations were a generally faithful reflection of the leases and the collective agreement. Certain matters, not explicitly or unambiguously covered by the written instruments, are of significance. Ordinarily the drivers were assigned to their own tractors,

---

[14] While such a discharge would not automatically terminate the affected driver's truck-lease agreement, it seems obvious that he would immediately exercise his 30-day cancellation privilege and thus remove his truck from Oklahoma's service.

[15] In contrast, the short-haul drivers of company-owned tractors received $50 per week plus two cents per mile.

though there were occasional exceptions. Oklahoma's truck superintendent testified that the owner-operators' services were not utilized each day. The owners were required to pay for all repairs, though Oklahoma conducted safety inspections.[16] The Company closely directed all details of loading and delivery routes. It instructed the drivers as to steps to be taken in emergencies. It administered physical examinations, supervised the preparation of reports required by the Interstate Commerce Commission, paid social security taxes and withheld income taxes, and provided workmen's compensation.

In sum, Oklahoma's operation possessed a number of the hallmarks of a genuine lease of equipment and a genuine employment arrangement.

Still, the Company was able to spare itself—and pass to the owner-operators—certain characteristic burdens of the transportation business. The large capital investment in the tractors and the risk of their premature depreciation or catastrophic loss, was borne by the owner-operators, not by the Company. The owner-operators, rather than Oklahoma, stood the risk of a rise in variable costs such as fuel, repairs and maintenance of the tractors in good operating condition, and living expenses, although the thirty-day cancellation privilege, taken together with the possible bargaining power of the owner-operators *en bloc*, may have affected the degree to which that burden was actually shifted. Finally, Oklahoma was able

---

[16] The provision of the collective agreement that the owner-drivers "shall be required to maintain the truck in good running condition" superseded, in the parties' practice, Oklahoma's undertaking in the lease agreement "to keep and maintain said motor vehicle equipment at all times while in operation under this lease agreement, in first class operating condition and in complete compliance with all safety rules and regulations of all State and Federal regulatory bodies." See 79 M. C. C., at 406, 407; 193 F. Supp., at 278.

to divest itself, to a significant extent, of the risk of non-utilization of high-priced equipment. The owner-operators received neither rental payments nor wages when their tractors were not used and they did not drive. Oklahoma did, however, carry the risk of a nonproductive backhaul.[17]

The question before the Commission was whether, under these particular facts, Oklahoma had so far emancipated itself from the burdens of transportation that to permit it, on such terms, to secure a transportation service from these unlicensed owner-operators would be inconsistent with the statutory scheme. The Commission resolved the issue adversely to Oklahoma and the owner-operators. Division 1, one Commissioner dissenting, held that the owner-operators were engaged in contract carriage and ordered them to cease and desist from the activities thus found to be unlawful until such time as they had secured the necessary permits from the Commission. Applications for such permits were invited, the Division's Report observing that the activities presently condemned should not prejudice such applications.[18] This disposition was approved by the full Commission on reconsideration.[19]

---

[17] Oklahoma paid an extra three cents per mile rental when there was a load of raw materials in the backhaul. This differential was explained as covering the cost of additional wear and tear and fuel purchases occasioned by the heavier raw materials transported on the return trips. At least to the extent that the differential was in fact absorbed by such incremental costs, it cannot be said to have represented the shifting of any financial risk.

[18] 79 M. C. C., at 415. Appellees assert that there is no presently licensed carrier able or willing to provide the type of service essential to Oklahoma's survival as a competitor. See Brief for Henry E. Drum et al., at 3. That circumstance should be presented to and considered by the I. C. C. in passing on appellees' permit applications; but it is not a reason for bypassing the Commission's licensing power if Oklahoma is not a private carrier.

[19] R. 167.

The Commission dealt with the problem before it by setting out two inquiries which would have to be satisfied before the operations in question could be held to constitute private carriage: *First,* it would have to be found that no person other than Oklahoma had "any right to control, direct, and dominate" the transportation. *Second,* it would have to be found that no person before the Commission was "in substance, engaged in the business of . . . transportation of property . . . for hire." [20] The Commission found against the respondents on both tests. In connection with the first, or "control," test the Commission pointed out that earlier decisions had established a presumption of for-hire transportation whenever equipment was leased by a shipper, which presumption might be defeated by a showing that the shipper had retained the exclusive right to control the operation. Despite the evidence of actual shipper control in this case, the Commission held that the presumption of for-hire transportation remained in effect because "There is present, whenever the owner-operator drives his own equipment, the right and power of the lessor to defeat any supposed right to control that the shipper-lessee may believe exists." [21] The three-judge District Court reversed the Commission's conclusion relative to shipper control,[22] and that action of the District Court is not challenged by the Commission on this appeal.[23]

[20] 79 M. C. C., at 409–410.

[21] 79 M. C. C., at 411.

[22] 193 F. Supp., at 281–282.

[23] See Brief for the United States and Interstate Commerce Commission at 17, n. 8:

"In this appeal, we do not challenge the district court's conclusion that the evidence did not warrant a finding that Oklahoma lacked full control of the details of the operation. Nor do we argue as to whether the court below gave too narrow a meaning to the Commission's control test. We assume, for present purposes, that the court below correctly applied that test as relating only to the operational aspects of the transportation."

But a finding of shipper control does not require a resolution of the ultimate issue in the shipper's favor.[24] It is true that until recently, "control" has been at the focus of the Commission's efforts to delineate verbally the permissible area of non-licensed leases of transportation equipment. The initial technique of the Commission was to assess the lessee-shipper's assumption of the burdens of transportation in terms of the degree to which he undertook to "control" or "dominate" it.[25] The interest in "control" in turn generated an interest in whether the drivers of leased equipment were in substance treated as the shipper's employees.[26] Throughout, however, Com-

---

[24] We need not and we do not now pass on the Commission's view that if the shipper does not direct the details of the operation he cannot be a private carrier.

[25] The leading case is *H. B. Church Truck Service Co.*, 27 M. C. C. 191, 195:

"Essentially the issue is as to who has the right to control, direct, and dominate the performance of the service. If that right remains in the carrier, the carriage is carriage for hire and subject to regulation. If it rests in the shipper, it is private carriage and not subject to regulation . . . ."

It was the *H. B. Church* case which established the presumption that a lease of equipment results in for-hire carriage. The presumption was said to "yield to a showing that the shipper has the exclusive right and privilege of directing and controlling the transportation service, as, for example, if the equipment were operated by the shipper's employee." 27 M. C. C., at 196.

[26] See, *e. g., Watson Mfg. Co.*, 51 M. C. C. 223, 226; *R. N. G. Commercial Auto Renters, Inc.*, 73 M. C. C. 665, 670.

*Teamsters Union* v. *Oliver*, 358 U. S. 283, did not, as appellees suggest (Brief for Henry E. Drum et al., at 29), hold that owner-operators are in any sense "employees." That case held that a bargaining unit including an overwhelming majority of concededly employed drivers of carrier-owned equipment was entitled, under § 8 (d) of the National Labor Relations Act, 61 Stat. 142, 29 U. S. C. § 158 (d), to bargain to impasse concerning minimum rentals to be received by owner-drivers. It was not necessary to determine

mission reports have taken note of various factors which clearly transcend any narrow concept of physical direction of the details of the operation; and it has always been apparent that the vesting of such physical "control" in the shipper would not in itself suffice to render the transportation private carriage.[27]

Latterly, the Commission has begun to move away from "control" as the verbal embodiment of its manifold inquiry.[28] The Commission thus accords explicit recognition to a premise which has long been implicit in its deci-

---

whether the owner-drivers were "employees" protected by the Act, since the establishment of the minimum rental to them was integral to the establishment of a stable wage structure for clearly covered employee-drivers. See *id.*, at 294–295.

[27] See, *e. g., Edward Allen Carroll,* 1 M. C. C. 788; *Centre Trucking Co.,* 32 M. C. C. 313; *William A. Shields,* 41 M. C. C. 100; *John J. Casale, Inc.,* 44 M. C. C. 45; *Motor Haulage Co.,* 46 M. C. C. 107; *Jacobs Transfer Co.,* 46 M. C. C. 265; *John J. Casale, Inc.,* 49 M. C. C. 15; *R. N. G. Commercial Auto Renters, Inc.,* 73 M. C. C. 665.

[28] See *Pacific Diesel Rental Co.,* 78 M. C. C. 161, 172–173:

"The primary question here . . . can be asked in two forms; namely (1) Is the transportation here involved such that any person or persons other than the purported private carriers have any right to control, direct, and dominate it, or (2) Are any persons here, in substance, engaged in the business of interstate or foreign transportation of property on the public highways for hire? . . . We are convinced here that, even if all the responsibilities of an employer with respect to the driver are assumed by a shipper, the service offered . . . is, in substance, for-hire motor carriage subject to regulation under part II of the act. To hold otherwise would be inconsistent with the remedial purpose of part II and would be in contravention of our duty, imposed by Congress . . . . It is evident that, were we to hold that the shipper's assumption (as an employer) of certain responsibilities which more normally fall upon a carrier, transforms an operation which, apart from such assumption, is clearly a for-hire carrier service, into an operation different in substance, we would open the door to unfair and destructive competitive practices contrary to the national transportation policy declared by Congress."

384

sions: That some indicia of private carriage may be assumed, and detailed surveillance of operations undertaken, without a shipper's having significantly shouldered the burdens of transportation. The test of substance with which the Commission supplemented its "control" inquiry in this case thus betokens no heedless departure from the beaten track of administrative decision which might occasion a judicial curb upon the exercise of administrative discretion.[29]  No more so does the inclusion in the arrangement between Oklahoma and its owner-drivers of a number of particulars also discoverable in arrangements found to constitute private carriage in earlier Commission decisions. We deal in totalities; indicia are instruments of decision, not touchstones. The Commission allowably dealt with this novel situation as an integral and unique problem in judgment, rather than simply as an exercise in counting commonplaces. Nor did it leave the basis for its decision unarticulated.

---

[29] The courts have commonly articulated their plotting of the boundary between private and regulated carriage in leased equipment cases in terms of over-all substance, rather than simply in terms of "control." See *Georgia Truck System, Inc.,* v. *I. C. C.,* 123 F. 2d 210, 212 ("[A]ppellant, in substance and in reality, operates a transportation business."); *A. W. Stickle & Co.* v. *I. C. C.,* 128 F. 2d 155, 160, 161 (test of "substance and reality"); *Lamb* v. *I. C. C.,* 259 F. 2d 358, 360 ("Simply stated [the issue] . . . is who was transporting the goods in question."); *B & C Truck Leasing, Inc.,* v. *I. C. C.,* 283 F. 2d 163, 165 (test of "substance and effect"); *I. C. C.* v. *Isner,* 92 F. Supp. 582; *United States* v. *La Tuff Transfer Service,* 95 F. Supp. 375; *I. C. C.* v. *Werner,* 106 F. Supp. 497; cf. *Bridge Auto Renting Corp.* v. *Pedrick,* 174 F. 2d 733; *John J. Casale, Inc.,* v. *United States,* 114 Ct. Cl. 599, 86 F. Supp. 167.  But cf. *Earle* v. *Babler,* 180 F. 2d 1016; *Vincze* v. *I. C. C.,* 267 F. 2d 577; *Motor Haulage Co.* v. *United States,* 70 F. Supp. 17, *affirmed,* 331 U. S. 784; *I. C. C.* v. *Gannoe,* 100 F. Supp. 790; *Allen* v. *United States,* 187 F. Supp. 625.

The Commission's meaning in applying the test of substance in this case is clearly told in the following language in its report:

> "Here each owner-operator assigns his motor vehicle for a continuing period of time to the exclusive use of the company, furnishing a service designed to meet the distinct need of the company. He provides a service in which the equipment is furnished, maintained, and driven by the owners thereof to transport property in interstate commerce. He guarantees a fixed and definite cost for the transportation, bears the risk of profit or loss from such transportation hazards as delays in transit, breakdowns of equipment, and highway detours, and meets all of the cost of operation including appropriate licenses and trip expenses." 79 M. C. C., at 412.

It is evident that the Commission here refused to allow Oklahoma the status of a private carrier because of its belief that financial risks are a significant burden of transportation, and its belief that such risks had been shifted by Oklahoma to the owner-operators to an extent which rendered the sanctioning of the operation as private carriage a departure from the statutory design. We think that such conclusions were well within the range of the responsibility Congress assigned to the Commission. The District Court explicitly recognized the propriety of the Commission's inquiring into the substance of the arrangements. Yet the court's conclusion that "what is involved here is private carriage on the part of the Company, rather than transportation for-hire by the owner-operators," 193 F. Supp., at 281, rests on no articulated premise other than that Oklahoma did have control. If the court intended to hold that the Commission is confined to the "control" test, we think it clearly in error in view of the

386

statutory objectives which we have set forth above. If, on the other hand, the court meant to substitute its judgment for the Commission's on the question of substance, we think that, on this record, it indulged in an unwarranted incursion into the administrative domain.

*Reversed.*

MR. JUSTICE DOUGLAS, whom MR. JUSTICE BLACK joins, concurring.

If I read the Court's opinion as my Brother HARLAN reads it, I would dissent from the disposition that is made of the case. The Commission is not a free-wheeling agency that can impose its ideas on this industry by *fiat.* Congress has provided the standard by which the Commission must adjudicate each case. And it is required to make not only findings that support its decision *(Interstate Commerce Comm'n* v. *J–T Transport Co.,* 368 U. S. 81), but also findings that are intelligible and complete. *United States* v. *Carolina Carriers Corp.,* 315 U. S. 475, 488–489. The case is for me a marginal one on which commissioners as well as judges might differ.* But I do not believe the Commission distorted the statutory standard nor made findings out of conformity with the facts.

Hence I join the opinion of the Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE WHITTAKER joins, dissenting.

Were this an instance of a District Court substituting its judgment for that of the Interstate Commerce Commission on a matter which Congress had reserved for agency determination, I would be among the first to maintain that the Commission's action should be respected. Cf. *I. C. C.* v. *J–T Transport Co.,* 368 U. S. 81, 126–130

---

*Three judges in the District Court disagreed with the Commission (193 F. Supp. 275) and one of the three Commissioners dissented. 79 M. C. C. 403.

(dissenting opinion). But the order entered by the Commission in the cases now before us is so utterly lacking in evidentiary support, so inconsistent with the uniform course of agency and court decisions, and so contrary to the regulatory plan embodied in the Motor Carrier Act of 1935 and its later amendments, that I cannot join in the judgment which reinstates that order. As I view this record what the Commission has done here amounts in effect to an exercise of power which it does not possess.

Under the Motor Carrier Act two things are indisputably clear: (1) Congress, in subjecting "private" motor carriage only to safety regulation, did not mean otherwise to regulate interstate transportation by persons of "their own goods in their own vehicles for commercial purposes" (79 Cong. Rec. 5651 (1935), remarks of Senator Wheeler, Chairman of the Senate Committee on Interstate Commerce); [1] (2) one engaged in the business of leasing motor vehicles for commercial carriage is not by that fact alone made a "contract carrier," subject to full Commission regulation; in other words, equipment rentals *as such* are not reached by the statute.[2] Under the plain terms of the Act and Commission rulings, economic regulation of such rentals comes into play only where "for-hire" motor carriage has been shown.[3]

---

[1] See also S. Doc. No. 152, 73d Cong., 2d Sess. 33 (1934); H. R. Doc. No. 89, 74th Cong., 1st Sess. 17 (1935); S. Rep. No. 482, 74th Cong., 1st Sess. 1 (1935); H. R. Rep. No. 1645, 74th Cong., 1st Sess. 4 (1935).

[2] There has been some equipment rental regulation by the States; whether it is also desirable as a matter of federal policy has yet to be determined by Congress. See Nutting and Kuhn, Motor Carrier Regulation—The Third Phase, 10 U. of Pitt. L. Rev. 477, 487–491 (1949); Note, 39 Ky. L. J. 338 (1951).

[3] The relevant statutory provisions are set forth in footnotes 1, 2, 3 and 5 of the Court's opinion. See also *U-Drive-It Co. of Pennsylvania,* 23 M. C. C. 799; *Scott Bros., Inc.,* 32 M. C. C. 253. In *Lease and Interchange of Vehicles by Motor Carriers,* 51 M. C. C. 461, 521,

This then is not a case like *Labor Board* v. *Hearst Publications, Inc.*, 322 U. S. 111, where the construction of an inexplicitly defined term in a statute which was broadly remedial was left to the agency enforcing the law. Despite strong suggestions to the contrary,[4] Congress saw fit to exempt private carriers from economic regulation under the Motor Carrier Act. If we were to permit the Commission to exercise its discretion to sweep in a variety of arrangements which legitimately constitute private carriage, we would be authorizing disobedience of the legislative mandate as surely as if we allowed the agency to remove from regulation what clearly amounts to "for-hire" carriage.

Until late 1952, Oklahoma Furniture Company, a manufacturer of low-priced furniture, shipped its product to retail purchasers throughout the United States in company-owned tractors and trailers, driven by its own full-time salaried employees. Discovering that some of its drivers were misusing company credit cards, given them to enable their charging against the Company operating and living expenses while on the road, Oklahoma revamped its long-haul transportation system in such a way as to remove these temptations.[5] In essence the new

the Commission did not premise its authority to regulate lease and interchange practices among common and contract carriers on any authority generally to control vehicles engaged in interstate commerce. The Commission rather inferred from its authority to regulate the transportation offered by common and contract carriers the power to regulate, as well, "the procurement of transportation." This conclusion in no way suggests its authority to regulate the rental of vehicles by noncarriers from companies engaged solely in rental activities.

[4] See S. Doc. No. 152, 73d Cong., 2d Sess. 26 (1934); Hearings before Senate Committee on Interstate Commerce on the Motor Carrier Act of 1935, 74th Cong., 1st Sess. 333, 345, 347–350 (1935).

[5] Short hauls of company products in company-owned and driven equipment remained unaffected by the new arrangement, presumably because there was less opportunity for the misuse of company credit cards in connection with such hauls.

arrangement involved, on the one hand, leasing from each of 11 of the Company's employee-drivers one of the tractors used in long-haul service,[6] and shifting to the driver the economic incidents of its maintenance and operation; and, on the other hand, preserving to the Company the exclusive use of the tractor in the conduct of its business, and keeping, in every practical sense, the employee relationship between the driver and the Company. The details of the arrangement and its operation are accurately summarized in the District Court's opinion.[7]

---

[6] The record does not show the terms on which the drivers acquired the tractors, whether they were bought from the Company or others, and if from the Company, what, if any, consideration was paid. The trailers drawn by these tractors continued to be owned by the Company.

[7] "The leases provide in substance as follows: (1) the Company shall pay the owner-operator 10¢ a mile for hauling single-axle trailers and 11¢ a mile for hauling tandem-axle trailers, plus an additional 3¢ a mile for back-haul of the Company's raw materials, (2) payments under the agreement shall be made weekly, (3) motor vehicles covered by the agreement shall be operated by an employee of the Company who shall be properly qualified and physically fit in accordance with state and federal regulations, (4) the owner-operator shall pay all operating costs arising from operation of said equipment (gasoline, oil, grease and parts) and shall pay cost of license plates, (5) the Company shall keep and maintain said equipment in first-class operating condition and in compliance with all safety rules and regulations of state and federal regulatory bodies, (6) if owner-operator fails to pay operating cost of equipment, the Company may cancel the agreement or at its option pay the necessary operating costs and charge same to owner-operator's account with the Company, (7) the Company shall have sole control, right of direction, and use of the leased equipment, all property transported by the leased vehicles shall belong to the Company and the Company will not sublease the equipment to any other person, firm or corporation, (8) the Company shall not be liable for wear, tear and depreciation nor for any damage caused to the leased equipment by accident, theft, fire or any other hazard or casualty, (9) the owner-operator shall not be responsible for loss to company equipment, property and cargo, (10) the Company will have the name of the owner-operator endorsed as an additional assured upon its policies of property damage and

The process of reasoning by which the Commission reached the conclusion that this rearrangement changed to fully regulatable activity that which had theretofore been subject to Commission jurisdiction only from the standpoint of safety, is at best obscure. However, the true measure of what the Court now sanctions is revealed

public liability insurance covering the operation of motor vehicles, (11) either party may cancel the lease upon giving 30 days' written notice to the other party, (12) the agreement shall remain in full force and effect for one year from date of execution and shall be automatically renewed for further periods of one year unless cancelled in accordance with provisions of the agreement, or terminated by operation of law.

"The Company also entered into a union contract as employer of its drivers. The contract covers both drivers of company-owned vehicles and the owner-operators who usually drive their own tractors and who are also treated by the Company as employees. Although all the drivers do not belong to the union, the terms of the contract apply equally to non-union employees. This contract provides, in pertinent part, as follows: (1) the Company may discharge any employee for cause, (2) the owner-operators shall be paid at the rate of 4.5 cents a mile for driving, 0.25 cents a mile for living expenses, and 0.25 cents a mile for labor in the maintenance of the truck, or a total of 5 cents a mile, and shall be paid 6 cents a mile for back-hauls of raw materials, (3) drivers of company-owned tractors shall receive a basic salary of $50 a week plus 2 cents a mile for driving, (4) owner-operators having driven 75,000 miles during a year in which the contract is in effect shall be entitled to vacation pay computed upon the rate of pay for driving and the average weekly mileage in the preceding year, (5) owner-operators shall maintain their trucks in good running condition at all times, (6) owner-operators shall pay their own living expenses while on the road, (7) the provision of the union contract which guarantees employees 6 hours work or pay if they report for work at their usual or regular time shall not apply to owner-operators.

"The record made before the Commission shows that the operations of the Company and the owner-operators are in substance carried on in accordance with the provisions of the lease agreements and the union contract, with one exception. The lease agreements provide that the Company shall maintain the tractors of the owner-operators and the union contract provides that the owner-operators shall main-

by laying bare the extent to which the agency's conclusion involved a departure from the common-sense criteria that have heretofore entered into Commission determinations as to whether particular arrangements reflected "private" or "for-hire" motor carriage.[8]

---

tain them.  The testimony in the record supports the Commission's finding that the owner-operators in fact maintain their vehicles.

"The record also reveals the following: The owner-operators are not authorized by the Interstate Commerce Commission to engage in the transportation of property either as contract carriers or common carriers by motor vehicle in interstate commerce.  The Company uses the 6 tractors which it owns chiefly for short hauls and these are usually driven by the salaried company drivers.  The tractors leased by the Company are utilized chiefly for long hauls and are usually operated by the owner-operators, each driving his own tractor.  It is the practice of the Company to assign the same driver to the same equipment, regardless of whether it is company-owned or leased.  However, when necessity or convenience make it more feasible to do so, drivers who usually drive company-owned tractors are assigned to leased tractors and owner-operators to company-owned tractors.  All trailers used in the Company's operations are owned by it.  A supervisor employed by the Company oversees all drivers, assigns trips and checks to see that all equipment is properly maintained and repaired.  Detailed routing instructions are issued to all drivers and compliance therewith is insured by manner of loading, e. g., last goods to come off are loaded first and the first to come off are loaded last.  Prior to departure drivers are handed a truck bill manifest which differs from a bill of lading in that the drivers are not required to sign a receipt for the freight they transport.  Each owner-operator receives two weekly paychecks, one for rental of his tractor and the other for his service as a driver.  The Company deducts from the paychecks of the owner-operators social security and withholding taxes, pays the employer's share of social security and provides workmen's compensation benefits for them.  The Company maintains on file drivers' logs, physicians' certificates and vehicle inspection reports.  Both company-owned tractors and leased tractors are garaged at the homes of their respective drivers.  The Company has the right to hire and fire drivers independently of the lease agreement."  193 F. Supp., at 277–278.

[8] See generally O'Brien, Twenty-Five Years of Federal Motor Carrier Licensing—The Private Versus For-Hire Carrier Problem, 35

The Court holds that the shifting of three economic burdens from the Company to the drivers justified the Commission's determination: (1) the substantial capital investments in the tractors, along with the risk of premature loss, were borne by the drivers; [9] (2) they undertook the costs of maintaining the vehicles and their own living expenses on the road; and (3) they bore the risk, as the Court envisages it, of "non-utilization of high-priced equipment" and of their own unemployment. These factors, either singly or in combination, do not, in my view, suffice to warrant the Commission's ruling. The first of them is the normal concomitant of any equipment rental; its presence cannot serve to change the character of a relationship which is not of itself subject to Commission regulation, except from the standpoint of safety (*supra*, p. 387, note 1). The costs of gas, repairs, and garaging are commonly also assumed by those leasing out motor vehicles for private use.[10] See, *e. g., R. N. G. Commercial Auto Renters, Inc.,* 73 M. C. C. 665; *Scott Bros., Inc.,* 32 M. C. C. 253; *U-Drive-It Co. of Pennsylvania,* 23 M. C. C. 799. The third factor, whatever may be its weight when supported by actuality, is, in the circumstances depicted in this record, no more than a pure abstraction (pp. 394–395, *infra*).

As the Court appears to recognize, the other provisions of the arrangement, relating to the cost of maintaining the leased equipment, all point to "private" carriage. Past

N. Y. U. L. Rev. 1150 (1960); Matthews, Truck Leasing By Shippers and the Problem of the Dangling Instrumentalities, 27 I. C. C. Prac. J. 370 (1960); Porter, Federal Regulation of Private Carriers, 64 Harv. L. Rev. 896 (1951).

[9] But see note 6, *supra*.

[10] To the extent that this second "risk" concerns personal living expenses on the road, it would be unrealistic to consider it a "risk" at all, since the cost of it was assumed, albeit at a flat rate of one-fourth cent per mile, by the Company under the terms of a collective-bargaining agreement with the labor union representing the drivers.

cases in the Commission where "for-hire" carriage has been found, in the face of similar provisions, all involved other factors not present here. Under this arrangement, the Company was entitled to exclusive use of the tractors during the rental period (cf. *Joseph A. Bisceglia,* 34 M. C. C. 233); it loaded, dispatched, and routed the trucks (cf. *William A. Shields,* 41 M. C. C. 100); [11] it instructed the drivers as to details of service (cf. *McKeown Transportation Co.,* 42 M. C. C. 792); it assumed the risk of loss or damage to the cargo (cf. *Edward Allen Carroll,* 1 M. C. C. 788); it paid for liability and property damage insurance (cf. *Centre Trucking Co.,* 32 M. C. C. 313); [12] it undertook to inspect the tractors to insure compliance with safety regulations (cf. *Driver Service, Inc.,* 77 M. C. C. 243); and it shipped the goods without bills of lading (cf. *Jacobs Transfer Co.,* 46 M. C. C. 265).

Nor is the Commission's case strengthened by the circumstance that the appellees, in addition to supplying the vehicles, provided their own services as drivers. That factor would be significant only if the appellees furnished these services as independent contractors, for it is only then that the arrangement differs from an equipment rental in which the lessee mans the leased vehicle with his *own* employees. It would be strange indeed to attribute to Congress a purpose to classify as a "for-hire" carrier any employee who, as a condition of employment, is required to purchase a vehicle in which his employer's goods are to be transported.

All the standards by which the Commission has previously tested a purported "employment" relationship

---

[11] Compare *Consolidated Trucking, Inc.,* 41 M. C. C. 737; *Jacobs Transfer Co.,* 46 M. C. C. 265 (shippers' control over routing and dispatching held insufficient to constitute private carriage).

[12] Since some equipment rental firms pay for liability insurance, the financial burden assumed by the appellees here may even have been less than that assumed by equipment rental firms.

prove the existence of such a relationship here. The Company paid the drivers' wages (cf. *Columbia Terminals Co.*, 18 M. C. C. 662);[13] deducted social security and federal income taxes (cf. *Motor Haulage Co.*, 46 M. C. C. 107); retained drivers' trip logs and medical certificates (cf. *Watson Mfg. Co.*, 51 M. C. C. 223); bargained with the drivers' labor union over conditions of employment (cf. *R. N. G. Commercial Auto Renters, Inc.*, 73 M. C. C. 665); and reserved the right to engage and discharge (cf. *John J. Casale, Inc.*, 49 M. C. C. 15). In *Teamsters Union* v. *Oliver*, 358 U. S. 283, we held that an agreement setting a minimum rental and other terms for the use of a lessor-driver's equipment was "within the scope of collective bargaining as defined by federal law." *Id.*, at 293. In light of the dissenting opinion, *id.*, at 297–298, it seems clear that the Court concluded that the lessor-drivers were employees, not independent contractors, for purposes of the National Labor Relations Act.

Despite the total supervision thus exercised by the Company, if the record revealed that these drivers really risked having no work at all, thus earning no wage, over any period of time, there might be room for argument that they were, in fact, independent contractors. Under the terms of their employment such a theoretical possibility exists, but the facts prove it could not happen.

The appellees were paid rental for their vehicles and wages for their services on a per-mile basis. But the testimony of the Company's truck superintendent shows that the Company deliberately attempted to distribute the work so as to assure to each driver weekly wages which were within limits acceptable both to the individual concerned and his labor union. Six tractors continued to be

---

[13] The Commission does not consider itself bound by the form in which wage payments are made and occasionally considers who it is who actually bears the wage burden. See *Roy Rittenhouse*, 78 M. C. C. 389. But even this factor is not always determinative. *Pacific Diesel Rental Co.*, 78 M. C. C. 161.

owned by the Company, and individual employees were assigned to these tractors, one to a vehicle, just as the appellees were in effect assigned by the Company to the tractors they owned. Those assigned to company-owned tractors were paid $50 a week plus two cents a mile, and they were dispatched on short hauls. The appellees were sent on long hauls, so that their total mileage would make up for the absence of any fixed wage.[14] In addition, if one of the appellees was sick, a driver usually assigned to a company-owned vehicle would be directed to operate the tractor belonging to the incapacitated man in order to assure him of at least the rental payment for his equipment. In short, there is nothing in the record which warrants a finding that the status of the appellees was anything other than that of *bona fide* employees, or that they *in fact* shouldered, or anticipated that they might have to bear, any of the economic burdens undertaken by independent contractors.

I am not unmindful that the Interstate Commerce Commission has, of late, been much concerned with the problem of drawing the line between legitimate equipment rentals, which it concedes to be "private carriage," and what it has come to call "pseudo-private carriage," *i. e.*, contract carriage disguised as lease of equipment.[15]

---

[14] The reasons for differentiating between long and short hauls, as respects the ownership of the tractors used in each type of service, have already been given. *Supra*, note 5.

[15] *E. g.*, 69 I. C. C. Ann. Rep. 99; 72 I. C. C. Ann. Rep. 43; 73 I. C. C. Ann. Rep. 51; 74 I. C. C. Ann. Rep. 57–58. A thorough study of the "gray area"—defined as "transport operations which lie between legitimate private carriage and the transportation authorized by Government regulatory bodies"—was recently submitted to the Senate Committee on Interstate and Foreign Commerce by the Commission's Bureau of Transport Economics and Statistics. It recognized that one major type of operation conducted in order to avoid regulation was the "shipper lease of vehicle with driver." I. C. C., Bureau of Transport Economics and Statistics, Gray Area of Transportation Operations (1960), 27–37.

396

Obviously the Commission must have the power to deal with schemes that have been devised to avoid regulation. No one would suppose that the Commission was acting beyond its authority if it pierced through the form assumed by a business enterprise purportedly engaged in providing equipment for "private" carriage and disclosed that it was really supplying "for-hire" carriage. Decisions of District Courts and Courts of Appeals have uniformly approved the application of the test of "substance" in such circumstances. *E. g., Lamb* v. *I. C. C.*, 259 F. 2d 358; *I. C. C.* v. *Isner*, 92 F. Supp. 582; *I. C. C.* v. *Gannoe*, 100 F. Supp. 790. I disagree with the result reached here by the Court, not because the Commission has supplemented its earlier test of "control" with one of "substance," [16] but because the application of the very test that is now urged persuades me that this was in reality an employment relationship with an employer engaged in private carriage, and not a "for-hire" carriage arrangement.

In sum, this is a case in which there is no allegation of subterfuge and no basis in the record for attributing a devious motive to the lessee; in which the economic risks transferred by the arrangement to the lessor are no more,

---

[16] In a leading decision the Commission set down a rule whereby "in cases in which the question of the status created by a lease of equipment with drivers by a carrier to a shipper is presented, in the absence of a showing to the contrary, the presumption arises that the transportation is performed by the carrier for compensation, in other words is for-hire transportation and as such is subject to regulation." *H. B. Church Truck Service*, 27 M. C. C. 191, 196. I do not quarrel with the general validity of this presumption, although, until the present case, even the Commission thought it applicable only to leases by those who were otherwise "for-hire" carriers. *John J. Casale, Inc.*, 44 M. C. C. 45, 52–53. It is only because the "showing to the contrary" in this instance is so overwhelming that I think it was impermissible for the Commission to apply that rule here.

and possibly even less, substantial [17] than those in the ordinary rental of equipment; and in which the actual conditions of hire disclose that the drivers are *bona fide* employees of the lessor and are protected by their union representatives against overreaching by the employer. The Commission's order is not saved by the "totality" test which the Court now brings to its aid. For however viewed, this record adds up to nothing more than a mere rearrangement of Oklahoma's private carriage activities in such a way as, and for no other purpose than, to protect the Company against being cheated by its long-haul driver-employees.

If it is within the range of the Commission's permissible discretion to classify these appellees as contract carriers—and thus subject them to the rigorous standards of financial fitness and suitability that the Commission's regulations require of such carriers—what has been thought of as the "gray" area becomes black, and, in truth, much of what has heretofore been taken for white is now gray. What, for example, would have been the result had title to these tractors remained with the Company under an arrangement whereby they were leased to the drivers and then subleased back to the Company, with the Company assuming the risk of catastrophic loss or destruction? Or what if the drivers had been guaranteed $50 a week in

---

[17] The Company here assumed the full cost of an unproductive backhaul, since it paid its drivers for their tractors and their services whether the trailer returned empty or full. If the backhaul was productive, four cents per mile was added to the total payment, possibly as compensation for increased wear-and-tear and more rigorous duties. Although a lease of equipment may, under certain circumstances, require a lessee to return the vehicle to the location where it was first taken, large rental firms do provide for one-way leases at slightly increased rates. The Company might, therefore, well have been able to reduce its loss on an unproductive backhaul by leasing equipment on terms which would have permitted it to return the equipment at the destination.

total rental and wages?   Would either of these changed circumstances have ousted the Commission of authority to hold the contracts to be "for-hire" carriage?

Indeed, the Court's decision goes far to encourage the Commission to obliterate entirely the congressionally drawn distinction between private and contract carriage. It will be interesting to see as time goes on whether there will be an aftermath to this decision similar to that which followed the blurring of the line between common and contract motor carriers effected by the Court's decision in *United States* v. *Contract Steel Carriers,* 350 U. S. 409.   See *I. C. C.* v. *J–T Transport Co., supra,* at 107–109 (dissenting opinion).

I would affirm.